UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF FLORIDA


UNITED STATES OF AMERICA,     )
                              )
                Plaintiff,    )
                              )
vs.                           )   CASE NO. 6:13-CR-67
                              )
DANIEL HEFFIELD,              )
                              )
                Defendant.    )
_____ )


TUESDAY, JANUARY 14, 2014; 1:38 p.m.
SENTENCING HEARING
BEFORE THE HONORABLE CHARLENE EDWARDS HONEYWELL
UNITED STATES DISTRICT JUDGE
ORLANDO, FLORIDA


FOR THE PLAINTIFF:
  KAREN GABLE


FOR THE DEFENDANT:
  JAMES SKUTHAN


_____

*Proceedings recorded by mechanical stenography
 Transcript produced by computer-aided transcription*

1                          I N D E X

2

3    Argument begins re objection(s)..............8

4

5    NEIL BURDICK:

6    Direct examination by Ms. Gable..............29

7    Cross examination by Mr. Skuthan............43

8    Redirect examination by Ms. Gable...........48

9

10   Further argument............................49

11   Victim statements...........................54,61

12   Defendant's statement.......................64

13   Argument/Statement by Mr. Skuthan...........65

14   Argument/Statement by Ms. Gable.............76

15   Rebuttal by Mr. Skuthan.....................80

16   The Court...................................80

17   Sentence pronounced.........................85

18

19

20

21

22

23

24

25

P R O C E E D I N G S

1

2          THE COURT:  Good afternoon.  We are here in United

3     States of America versus Daniel Heffield, case 6:13-CR-67.

4          Counsel, please identify yourselves for the record.

5          MS. GABLE:  Good afternoon, Your Honor.  Karen Gable on

6     behalf of the United States.  I'm appearing with Special Agent

7     Rod Hyre with the FBI and Special Agent Neil Burdick with the

8     Department of Homeland Security.

9          MR. SKUTHAN:  Good afternoon.  James Skuthan on behalf

10    of Daniel Heffield.  I'll be joined by Roy Matthews from our

11    office.  He's an investigator.  He'll be sitting at counsel

12    table today, Your Honor.

13         THE COURT:  Okay.

14         MR. SKUTHAN:  Okay.

15         THE COURT:  Madam clerk, please place the defendant

16    under oath.

17         DEPUTY CLERK:  Mr. Heffield, please stand and raise your

18    right hand.  Do you solemnly swear the testimony you will give

19    in this case will be the truth, the whole truth, and nothing

20    but the truth, so help you God?

21         THE DEFENDANT:  I do.

22         DEPUTY CLERK:  Please state your name, sir, for the

23    record.

24         THE DEFENDANT:  Daniel Heffield.

25         DEPUTY CLERK:  Please take a seat.

1          THE COURT:  Mr. Heffield, on August 29th, 2013, you

2     entered a plea of guilty to Count 2 of the superseding

3     indictment, which charged you with sexual exploitation of a

4     minor.  This is a violation of Title 18, United States Code,

5     Sections 2251(a) and (e).  And then, you also entered a plea of

6     guilty to Count 9 of the superseding indictment, which charged

7     you with possession of child pornography.  This is a violation

8     of Title 18, United States Code, Sections 2252A(a)(5)(B) and

9     (b)(2).  The Court has previously accepted your guilty plea and

10    adjudicated you guilty of these offenses.  We are here today

11    for the purpose of sentencing.  However, prior to imposing

12    sentence, the Court is going to ask some questions.

13         The first question, Mr. Heffield, is have you had an

14    opportunity to review and discuss the presentence report?

15         THE DEFENDANT:  I have.

16         THE COURT:  Do you have any questions regarding that

17    report?

18         THE DEFENDANT:  No.

19         THE COURT:  Do you have any objections as to the facts

20    contained in the report?

21         THE DEFENDANT:  Yes.

22         THE COURT:  Okay.  And I will allow Mr. Skuthan to

23    elaborate on those.  And then, do you wish to make objections

24    to the probation officer's application of the guidelines?

25         MR. SKUTHAN:  We've already made objections, Your Honor.

1    I think those are the same objections he would have.

2         THE COURT:  Okay.  Mr. Skuthan, have you had an

3    opportunity to review the presentence report?

4         MR. SKUTHAN:  Yes, Your Honor.

5         THE COURT:  And do you have any objections as to the

6    factual accuracy of the report?

7         MR. SKUTHAN:  No, Your Honor.

8         THE COURT:  And do you wish to make -- well, then, let

9    me go back, then, because I think your client said yes, so I

10   need to find out what are your client's objections to the facts

11   contained in the report?

12        MR. SKUTHAN:  If I could have a moment.

13        THE COURT:  Yes.

14        MR. SKUTHAN:  I think there's some confusion.

15             (Pause in proceedings.)

16        The only objections we have, Your Honor, are the ones

17   that I filed with the Court, so --

18        THE COURT:  And those objections are to the application

19   of the guidelines?

20        MR. SKUTHAN:  That's correct.

21        THE COURT:  Okay.  So then, there are no objections as

22   to the facts?

23        MR. SKUTHAN:  That's correct.

24        THE COURT:  All right, thank you.

25        And then, finally, Mr. Skuthan, do you wish to make

1    objections?  Indeed, you have made objections to the probation

2    officer's application of the guidelines, and I'll come back and

3    we'll go through those in just a moment.

4        MR. SKUTHAN:  Your Honor, there is one fact that I

5    noticed earlier, and I talked to Probation about it.  It just

6    has to do with the statutory maximum that's incorrectly stated.

7        THE COURT:  What paragraph number?

8        MR. SKUTHAN:  That would be paragraph number -- I

9    believe it's 91.  Probation can correct me if I'm wrong,

10   because we've had an addendum.  The maximum term of

11   imprisonment as to Count 2 should be 30 years.

12       PROBATION OFFICER:  The minimum?

13       MR. SKUTHAN:  The maximum.

14       PROBATION OFFICER:  15 to 30.

15       MR. SKUTHAN:  That's correct.

16       THE COURT:  Okay.  I'm sorry, what -- paragraph number

17   90?

18       PROBATION OFFICER:  Paragraph number 89 on page 14 or --

19       MR. SKUTHAN:  That's correct.  I'm looking at the

20   previous -- the one prior to the addendum.

21       THE COURT:  Okay, so 89.

22       MR. SKUTHAN:  That's correct.

23       PROBATION OFFICER:  It should be 15 to 30.

24       MR. SKUTHAN:  That's correct.

25       THE COURT:  Okay.  It presently reads -- and this is

1     paragraph 89, page 14 -- the minimum term of imprisonment on

2     Count 2 is 15 years, and the maximum term is life.  And your

3     request is that that be corrected to comply with the statute,

4     which indicates that the maximum term is 30 years; is that your

5     request?

6              MR. SKUTHAN:  Yes, Your Honor.

7              THE COURT:  Ms. Gable, do you wish to be heard?

8              MS. GABLE:  I agree with Mr. Skuthan, Your Honor.

9              THE COURT:  Okay.

10             PROBATION OFFICER:  Excuse me, Your Honor.  The page 2

11    of the presentence report also reflects a life imprisonment

12    maximum, so is it okay to change -- correct that as well?

13             THE COURT:  Yes.

14             PROBATION OFFICER:  Okay.  I apologize.

15                  (Pause in proceedings.)

16             THE COURT:  All right.  Then going to the -- well, let

17    me hear from Ms. Gable first.  Do you know of -- Ms. Gable,

18    have you had an opportunity to review the presentence report?

19             MS. GABLE:  Yes, Your Honor.

20             THE COURT:  And do you have any objections as to the

21    facts contained in the report?

22             MS. GABLE:  No, Your Honor.

23             THE COURT:  Do you have any objections as to the

24    probation officer's application of the guidelines?

25             MS. GABLE:  No, Your Honor.

1          THE COURT:  All right, thank you.

2          All right.  Then, Mr. Skuthan, let's go back and take up

3     your objections with regard to the probation officer's

4     application of the guidelines.  And the first one reflected in

5     the PSR is with regard to paragraph 46.  Are you maintaining

6     that objection?

7          MR. SKUTHAN:  Yes, Your Honor.  I will tell you that

8     there is some 11th Circuit case law to the contrary on that.

9     But I think in this particular case, you have a situation -- in

10    other words, the objection to 4B1.5, I think, is a stronger

11    objection.  But in this particular case, you have Mr. Heffield

12    charged in an indictment with three counts of production,

13    counts of possession.  He entered a plea agreement to plead one

14    count of production and one count of possession.  And as to the

15    possession count, there is no instances of sexual contact with

16    children.

17         THE COURT:  All right.  I think you're talking about a

18    different one.  My objection shows paragraph 46 with regard to

19    images of sadistic or masochistic conduct.

20         MR. SKUTHAN:  We withdrew that objection.

21         THE COURT:  Okay.  That's what I just -- I thought I saw

22    that in your memorandum, but I wanted to make sure for the

23    record, because the PSR still has that as one of your

24    objections.

25         MR. SKUTHAN:  That's correct.

1          THE COURT:  So that is no longer an objection?

2          MR. SKUTHAN:  No, Your Honor.

3          THE COURT:  Okay, then that takes us to paragraph 47.

4     And 47 deals is with the pattern of abuse, and I think that's

5     what you were addressing.

6          MR. SKUTHAN:  That's correct, Your Honor.

7          This deals with the charge of possession of child

8     pornography and that's scored under 2G2.2.  And under 2G2.2,

9     which is subsection (b)(5), there's an enhancement that the

10    defendant engaged in a pattern of activity involving the sexual

11    abuse or exploitation of a minor.

12         Now, he's charged in this count with possession of child

13    pornography.  I don't think there's any dispute that there is

14    no pattern of activity involving the sexual abuse or

15    exploitation of a minor as to that particular count.  That

16    count deals with items that were found on his computer that

17    contain child pornography.

18         Those images do not contain any images of Mr. Heffield

19    exploiting any child or sexually abusing any child.  And that's

20    the plain reading and plain meaning of that particular

21    guideline provision of subsection 5.  So we think the Court

22    should find that that -- the Court should sustain that

23    objection.  Because in the possession count, there was no

24    pattern of activity involving sexual abuse or exploitation of a

25    minor.  I don't think there is any dispute as to that fact.

1           Now, I will concede that the commentary to that

2    particular guideline states in the definition number one -- and

3    they don't have subsections here, but the Court's aware that it

4    states:  "A 'pattern of activity involving the sexual abuse or

5    exploitation of a minor' means any combination of two or more

6    separate instances of the sexual abuse or exploitation of a

7    minor by the defendant, whether or not the abuse or

8    exploitation occurred during the course of the offense;

9    involved the same minor; or resulted in a conviction for such

10   conduct."  So again, we think the plain reading of that

11   particular guideline would hold that you would have to find

12   that type of pattern of activity within the charged count,

13   which is possession.

14          Now, to the extent the commentary is contrary to that,

15   I understand that the Supreme Court has held that the

16   commentary is authoritative, unless it is inconsistent with the

17   guideline or unless it provides an unconstitutional reading of

18   the guideline.  And we would submit to the Court that the

19   commentary defining pattern of activity involving the sexual

20   abuse or exploitation of a minor is inconsistent with the

21   guideline, because the guideline talks about the offense for

22   which he has been convicted which, in this count, is possession

23   of child pornography.

24          We think it also is an unconstitutional reading of the

25   guideline, because what it does is it allows there to be an

1    increased sentence, a substantially increased sentence, without

2    having to prove -- without having to make allegations and do an

3    indictment and to prove beyond a reasonable doubt that

4    enhancement.  It would just have to be according to the way the

5    guideline reads or the commentary reads, by a preponderance of

6    the evidence, and that would violate the constitutional right

7    of the defendant.  So, we think based on that the Court should

8    hold that that enhancement does not apply, as well as the facts

9    I don't think support it.  However, I will concede that there

10   is 11th Circuit case law that appears to be to the contrary on

11   that, so I wanted to make the Court aware of that.

12        THE COURT:  Do you have the 11th Circuit case?

13        MR. SKUTHAN:  It's the case that Ms. Gable had cited.

14        THE COURT:  Okay.

15        MR. SKUTHAN:  So that would be my objection to that.

16   But I do think there is a valid objection as to the

17   constitutionality of the commentary, as well as the commentary

18   being inconsistent with the guideline.

19        THE COURT:  All right, thank you.

20        Ms. Gable, you may respond as to paragraph 47, pattern

21   of abuse.

22        MS. GABLE:  Yes, Your Honor.

23        The government stands by its argument in its sentencing

24   memorandum filed at docket number 52.  We went through an

25   analysis, according to the guideline, as to why the enhancement

1    absolutely applies in this case.  It is not my understanding

2    that defendant's objection is not that the defendant -- that

3    there are multiple victims in this case or the defendant

4    produced videos of child pornography on more than two

5    occasions.  So if you apply under the guideline and go through

6    the test, because the defendant did engage in a pattern of

7    activity involving the sexual abuse or exploitation of a minor,

8    and that because the commentary to 2G2.2 defines a pattern of

9    activity as any combination of two or more separate instances

10   of the sexual abuse or sexual exploitation of a minor by the

11   defendant, whether or not the abuse or exploitation (A)

12   occurred during the course of the offense; (B) involved the

13   same minor, or (C) resulted in a conviction for such conduct.

14         And because the commentary defines sexual abuse or

15   exploitation as the production of child pornography under 18

16   USC, Section 2251, or an attempt to do so, that under these

17   facts, with the defendant attempting to produce between 25 to

18   50 videos of child pornography with the agent recovering 14

19   videos and with 9 of them showing individuals who were under

20   the age of 18 years of age -- we have multiple victims in this

21   case occurring over a two-week period of time -- that the

22   adjustment does apply.

23         As to the defendant's argument that it pertains only to

24   the offense of conviction, the guideline under 2G2.2 provides

25   under 2G2.2(b)(5), "If the defendant engaged in a pattern of

1  activity involving the sexual abuse or exploitation of a minor,

2  increase by 5 offense levels."  There's nothing to suggest that

3  this has to do with only possession of child pornography.

4       Further, Your Honor, as to the defendant's argument as

5  to constitutionality, the defendant cites no cases that it is

6  unconstitutional for the Court, in a sentencing setting, to be

7  the finder of fact as to those facts that would increase a

8  sentence.  Of course, if the government were to charge an

9  offense where facts increased the statutory minimum penalty or

10 the statutory maximum penalty then, of course, we would have to

11 prove it to a fact finder beyond a reasonable doubt.  But in

12 the sentencing setting where we're just talking about

13 sentencing factors that do not increase the mandatory minimum

14 or maximum term of imprisonment, there's nothing

15 unconstitutional.  In fact, it is the Court's role to be the

16 fact finder in this setting.

17      THE COURT:  And are you relying on United States versus

18 Carter from the 11th Circuit?

19      MS. GABLE:  Your Honor, I am.  United States versus

20 Carter is a case where both the pattern adjustment under 2G2.2

21 and the adjustment under 4B1.5 was applied.  And the 11th

22 Circuit, in an unpublished opinion, found that those

23 adjustments were appropriate and that it was not double

24 counting.

25      MR. SKUTHAN:  Your Honor, if I may respond.

1          THE COURT:  Yes.

2          MR. SKUTHAN:  Your Honor, in the Carter case, it's

3    important to point out that the possession of the child

4    pornography also included images of the defendant engaging in

5    sexual acts, and that's different than this case as to the

6    possession count.

7          The other thing I would point out is if you look at the

8    enhancement, it's a 5-level enhancement.  And what that does is

9    it raises the defendant well above the 10-year statutory

10   maximum.  And under the statute, the maximum penalty for

11   possession of child pornography in this case, because this case

12   occurred before the statute was amended, is the maximum penalty

13   of ten years in prison.  So what ends up happening here, it

14   does increase the statutory maximum.  It goes -- it's putting

15   it above that amount by trying to establish facts.

16         Now, I understand that the statutory maximum won't be

17   increased by the Court.  I understand that.  But what it does

18   is it gives him a guideline range that goes above that.  And I

19   think that's problematic, because what you're doing here is

20   you're taking something that did not occur in the possession

21   offense and then you're taking two other alleged acts and

22   you're increasing the penalty for the defendant, and I think

23   that's problematic.

24         The other thing, too, I was able to point out.  In the

25   Carter case, Mr. Carter possessed images of sexual exploitation

1  on the possession count, and I think that makes that different

2  than this case.

3       THE COURT:  Okay.  Well, with regard to the enhancement

4  creating an advisory guideline sentence that is above that of

5  the statutory maximum, this certainly isn't the only instance

6  where that occurs.  And I think the guidelines basically direct

7  the Court as to what to do when that occurs.  The statutory

8  maximum becomes the guideline sentence.  Even though if you

9  were to literally apply the guidelines, the guidelines may call

10  for a greater sentence in terms of the advisory recommendation,

11  but we all know that the Court is not allowed to impose greater

12  than the maximum that's set forth by Congress with regard to

13  the offenses.

14       As it relates to the defendant's objection as to

15  paragraph 47, pattern of abuse, I certainly understand the

16  argument, and I do agree that there is some distinction between

17  this case and the Carter case.  However, I do find that the

18  enhancement, the 5-level enhancement, is appropriate given the

19  fact that the -- when I consider the facts of this case which

20  are basically undisputed and, by this case, I'm referring to

21  Mr. Heffield's case and then the commentary to Section 2G2.2,

22  which defines a pattern of activity as "...any combination of

23  two or more separate instances of the sexual abuse or sexual

24  exploitation of a minor by the defendant, whether or not the

25  abuse or exploitation (A) occurred during the course of the

1    offense; (B) involved the same minor; or (C) resulted in a

2    conviction for such conduct."

3         And so, I'm going to overrule the objection.  I likewise

4    find that this provision is constitutional.  I am persuaded by

5    the opinion in United States versus Carter at 292 Fed.Appx. 16,

6    2008 WL 3929344 out of the 11th Circuit 2008.  I recognize that

7    it is an unpublished decision, but certainly it is persuasive

8    in terms of its analysis with regard to this issue.

9         The next objection that I see here, Mr. Skuthan, is with

10   regard to paragraph 57, Repeat and Dangerous Sex Offender.

11        MR. SKUTHAN:  That's correct, Your Honor.

12        In this case, there is an enhancement under 4B1.5 of the

13   guidelines, which refers to -- there's two provisions there, as

14   the Court is aware.  It's called Repeat and Dangerous Sex

15   Offender Against Minors, and there is a subsection (a) and a

16   subsection (b).  And the subsection (a) is what was applied --

17   I'm sorry -- subsection (b) is what was applied in this

18   particular case.

19        Now, I think before I go any further, I'd have to -- in

20   looking at the government's sentencing memorandum on page 5, it

21   appears what the government is arguing at the very top of the

22   page, that the agents located 14 videos.  At least three of the

23   videos titled, S01, S12, and S13 show two different

24   prepubescent girls on three separate occasions using the

25   toilet.  In the videos, their naked vaginas are prominently

1    displayed.

2         Now, the first part of this objection relates to the

3    fact that there were three child production counts or child

4    pornography production counts.  Pursuant to a plea agreement,

5    two of the child pornography production counts were dismissed

6    or the government was going to recommend their dismissal, and

7    Mr. Heffield pled guilty to Count 2, which is production of

8    child pornography on one occasion.

9         Now, obviously the whole purpose of a plea agreement is

10   to get a benefit to both sides of the bargain, and it saves the

11   government the time and expense of trying a case.  It saves the

12   Court the time and expense of trying the case.  And

13   Mr. Heffield has been nothing but remorseful throughout this

14   entire process, starting with his arrest.

15        But in this particular case, it appears that what is

16   going on here is even though two of the counts were dismissed

17   and he pled guilty to one count, that Probation Office and the

18   Government are arguing that those two counts should still come

19   in, in the form of an enhancement against Mr. Heffield.  And as

20   the Court is aware, it's a very substantial enhancement.  So

21   that would be my first argument on that point.

22        I would submit that because he only pled guilty to one

23   count, that is the only count that can be evaluated by this

24   Court, and just that one count is not enough to sustain the

25   enhancement under 4B1.5.  Otherwise, if it's used against the

1    defendant to increase his sentence to the extent that Probation

2    indicates, then there would have been no reason for the

3    defendant to enter a plea in this case.  He could have just

4    gone to trial and, obviously, there's a benefit by all parties

5    for him pleading guilty.

6         Now, the second argument pertaining in that objection --

7    that would be the first argument.  The second argument is it

8    appears what the government is arguing is that there is three

9    images -- SO1, S12, and S13 -- that detail child pornography.

10   And if that's the case, we think there's an argument that that

11   is not enough to sustain or to grant the enhancement.  Now,

12   that might not be the government's argument, so I'd have to let

13   the government speak to that.  The government might argue that

14   there's more than those three videos that would contain child

15   pornography.  So, I can tailor my argument based on what the

16   government's position is on that.

17        I know that the government also may argue that there is

18   an attempted child production count.  We'd have an argument

19   against that as well.  So, it might streamline things a little

20   bit better, at least for the Court, if the government could

21   indicate what they're seeking as far as -- well, what they

22   indicate are the images that contain child pornography out of

23   these videos.

24        THE COURT:  Okay.  Ms. Gable, you may respond to the

25   objection as to paragraph 57 regarding United States Sentencing

1    Guideline, Section 4B1.5(b)(1).

2         MS. GABLE:  Yes, Your Honor.

3         I was not prepared.  I thought that the defendant

4    conceded that the videos were child pornography.  But we have

5    brought a disc that contains child pornography, contains all of

6    the videos for the Court to review.  There are many videos that

7    would constitute child pornography that Mr. Heffield produced,

8    and I can call the agent and have an agent testify about those

9    and have the Court take a look at those videos.  But under a

10   pure application --

11        THE COURT:  Well, let me just stop you.  Are you arguing

12   that there are some that are not child pornography?  Or is your

13   argument rather that the government should not be allowed to

14   include the facts that relate to the counts for which your

15   defendant did not enter a plea of guilty?

16        MR. SKUTHAN:  That was my first argument on this issue.

17   My second argument is in reading the government's sentencing

18   memo, they point out three videos that they believe contain

19   child pornography.  And I understand -- I've seen those videos,

20   but I don't know if they're making an allegation that all the

21   videos that the defendant had in his possession constituted

22   child pornography.

23        THE COURT:  But do you dispute that the videos titled

24   SO1, S12, and S13 contain child pornography?

25        MR. SKUTHAN:  Well, not S12 and SO1.

1          THE COURT:  Okay.  All right.  Ms. Gable.

2          MS. GABLE:  Well, Your Honor, then, I guess we'll have

3    to have some presentation as to the other videos of child

4    pornography that Mr. Heffield produced.  But even if you only

5    accept that S1 and S12 contain child pornography, under a clear

6    reading of 4B1.5 -- and again, this is detailed in our

7    sentencing memo, so we would refer to our argument in that

8    document -- that guideline provides for a 5-level adjustment

9    for individuals who are repeat and dangerous sex offenders

10   against minors.

11         The guideline provides for that 5-level enhancement

12   where the defendant's offense of conviction is a covered sex

13   crime, and the defendant engaged in a pattern of activity

14   involving prohibited sexual conduct.  The guideline defines a

15   covered sex crime as a Chapter 110 offense which, in this case

16   the production of child pornography is a Chapter 110 offense,

17   so it is a covered sex crime within the meaning of the

18   guideline.

19         The guideline then provides that a defendant who engages

20   in prohibited sexual conduct with a minor on at least two

21   separate occasions without regard to whether the occasion

22   occurred during the course of the offense or resulted in a

23   conviction engages in a pattern of activity, and the guideline

24   does define prohibited sexual conduct as the production of

25   child pornography.

1          In this case, again, we have a pattern where the

2     defendant was -- successfully produced approximately 14 videos

3     showing 8 different children under the age of 18.  And the

4     focus, again, was on their genitalia, which he surreptitiously

5     recorded while they used his bathroom, while they took piano

6     lessons from his mother.  We have the videos.  If he engaged in

7     the pattern of conduct, a straightforward reading of the

8     guideline shows that it applies.

9          As to Mr. Skuthan's argument that the government can't

10    rely on facts and dismiss counts, there is no law to that.

11    And, in fact, the Carter case is to the contrary.  In our whole

12    system, the guidelines take into account all relevant conduct,

13    Your Honor.  And in this case, the defendant's plea bargain was

14    a very good one.  He pled to two counts.  He capped his

15    statutory maximum to 40 years.  And by pleading, he avoided a

16    guideline calculation that would have sent him over to life.

17    So to suggest that somehow this is unfair or that the

18    guidelines can't take into consideration relevant conduct is

19    just -- it's not contemplated within the guideline scheme, and

20    the Court is directed under 4B1.5 to apply the enhancement, and

21    it's appropriate in this case.

22         THE COURT:  All right, thank you.  Mr. Skuthan.

23         MR. SKUTHAN:  Your Honor, if the argument is that

24    there's only two videos, SO1 and S12, that that would

25    constitute child pornography, then I don't think the Court can

1   apply the enhancement for two reasons.  Number one, there must

2   be two incidents in addition to the offense conduct.  The

3   offense conduct in this case as to Count 9 is -- I'm sorry --

4   as to Count 2 in the indictment is the video contained in S12,

5   okay, so that's the offense of conviction.

6        My reading, and I think the reading is supported by the

7   guideline in the commentary is that there must be two

8   additional acts that would constitute a pattern of activity,

9   and I don't think there is two additional acts.  And the reason

10  why I would say this is because if you look at application of

11  subsection (b) which is in the commentary to 4B1.5, Application

12  Note number 4.

13       THE COURT:  Okay.  You know what, let me --

14            (Brief pause in proceedings.)

15       Okay, 4B1.5, and where are you looking?

16       MR. SKUTHAN:  Application Note number 4.  And if you go

17  to subsection (B), capital B, Determination of Pattern of

18  Activity, it says:  "In General - For purposes of subsection

19  (b), the defendant engaged in a pattern of activity involving

20  prohibited sexual conduct if on at least two separate occasions

21  the defendant engaged in prohibited sexual conduct with a

22  minor."  Now, that's the first definition, the general

23  definition.

24       The second definition says:  "Occasion of Prohibited

25  Sexual Conduct - An occasion of prohibited sexual conduct may

1   be considered for purposes of subsection (b) without regard to

2   whether the occasion (I) occurred during the course of the

3   instant offense or (II) resulted in a conviction for the

4   conduct that occurred on that occasion."

5        So, assuming the Court will find that -- and the Court

6   would have to find that S12 is child pornography, that's the

7   one the defendant pled guilty to, that would be the offense of

8   conviction.  There would have to be two additional child

9   pornography images.  And if you look at S12 and S13, the

10  government has indicated that those are the same person in S12

11  and S13.  So we would submit that there would have to be two

12  separate additional victims, in addition to the victim and the

13  offense conduct.  I think that's the clear reading of

14  subsection (B)(ii).

15       Now, to further argue that point, the Court could go a

16  similar definition back in 2G2.2, the guideline commentary

17  provision we just discussed a few minutes ago.  That also has

18  the definition for pattern of activity, and this is for 2G2.2,

19  which says that --

20       THE COURT:  What's the application?  Oh, I see.  You're

21  just reading under the Application Notes under Definitions?

22       MR. SKUTHAN:  Yes, Your Honor, I'm sorry.

23       THE COURT:  Okay.

24       MR. SKUTHAN:  It's the one we looked at previously.

25       THE COURT:  Mm-hmm.

1          MR. SKUTHAN:  And it says:  "...separate instances of

2    the sexual abuse or sexual exploitation of a minor by the

3    defendant, whether or not the abuse or exploitation (A)

4    occurred during the course of the offense; (B) involved the

5    same minor; or (C) resulted in a conviction for such conduct."

6    That's a much broader definition, because it says in (B),

7    "...involved the same minor."

8          The definition in 4B1.5, Application Note 4(B)(ii) is

9    much narrower, because it defines it similarly, but it says:

10   "...whether the occasion occurred during the course of the

11   instant offense or resulted in a conviction for the conduct

12   that occurred on that occasion."  It does not include the term,

13   "...involved the same minor."

14         So, while the government may argue that S12 and S13 are

15   involving the same minor, that is not enough to sustain or to

16   impose the enhancement in this case, because the offense of

17   conviction would be S12.  And assuming for argument that S1 is

18   child pornography, then that would be one additional instance,

19   not two additional instances.

20         THE COURT:  And your argument is because you believe

21   that because the victim in S13 is the same as the victim in

22   S12?

23         MR. SKUTHAN:  That's correct.  And I think a plain

24   reading of the guideline there would provide that result,

25   especially when you compare it with 2G2.2 and the definition of

1    almost the exact same phrase in the Application Notes there.  I

2    mean, clearly, in one instance it makes no difference that it

3    involves the same minor, which is 2G2.2, which is a much

4    broader reading than there is in 4B1.5.

5         THE COURT:  All right, thank you.  Ms. Gable.

6         MS. GABLE:  Your Honor, the videos -- there are eight

7    different victims portrayed in the videos, so I would suggest

8    that I call the agent, and we'll have the Court review the

9    videos.

10        THE COURT:  All right.

11        MR. SKUTHAN:  We have no objection to that.

12        THE COURT:  Call your agent.

13        MS. GABLE:  Thank you, Your Honor.

14        Your Honor, what I propose to the Court is I have an

15   agent that brought a laptop computer.  If we could approach the

16   Court, plug in the laptop computer, and the Court could view

17   the videos up in that way, we would avoid displaying this.

18        MR. SKUTHAN:  We have no objection to that.

19        THE COURT:  How is opposing counsel supposed to view it

20   if you do that?

21        MR. SKUTHAN:  I would come up there with you.

22        DEPUTY CLERK:  I have to look for a power connection up

23   there, if you're going to look at it up there.

24        THE COURT:  Why can't we just clear the courtroom?  I

25   mean, I guess -- counsel, approach the bench.

```
 1              [Sidebar:]

 2        THE COURT:  It what is the concern?

 3        MS. GABLE:  Because we have these monitors that will --

 4   everybody in the back would be able to see these little girls.

 5   They're all victims.  And these children are between the ages

 6   of six and -- I mean, there are two girls that were 18 which,

 7   of course, do not constitute child pornography, but they're

 8   between the ages of four and -- either four or six and I think

 9   16 years of age.  And, I mean, they're using the bathroom and

10   they're wiping and their naked genitalia is exposed.

11        I don't want to further victimize these children.  I

12   mean, frankly, their faces are obscured for the most part,

13   because that was not the focal point, obviously, of the videos.

14   But I just -- typically with child pornography what I do is I

15   try and even during a trial, I'll try and shut down monitors so

16   that the audience does not see the child pornography and that

17   it's only viewable at defense table and to the Court, and I

18   even turn off the monitors at the government table.

19        THE COURT:  Can we do that, madam clerk, just turn off

20   those monitors back there?

21        DEPUTY CLERK:  Yes.

22        THE COURT:  We can do that.  We can just turn off those

23   monitors.

24        MS. GABLE:  I just would be concerned about the monitor

25   at defense counsel's table, so --
```

1            MR. SKUTHAN:  I can turn it, if that's possible.  I can

2    just turn it.

3            THE COURT:  I don't know that anyone sitting back there

4    can really see the one at defense counsel's table.  But if so,

5    we can have the marshal stand so that they can't see it, if

6    it's a problem.

7            MR. SKUTHAN:  That's fine.

8            MS. GABLE:  That would be fine.  Okay, thank you, Your

9    Honor.

10           THE COURT:  And the others we can turn off.

11           DEPUTY CLERK:  In the jury box?  There's a little button.

12           THE COURT:  Well, there's nobody in the jury box.  I'm

13    not as worried about that one, but that one at the presentation

14    cart.

15           DEPUTY CLERK:  The back one shut off and just the two

16    front tables on?

17           THE COURT:  Do you want yours on?

18           MS. GABLE:  We can turn ours off.

19           DEPUTY CLERK:  So what stays on?

20           THE COURT:  The one here.

21           MR. SKUTHAN:  I would need to look at mine.

22           THE COURT:  Defense counsel.

23           MS. GABLE:  And then for the Court.

24           THE COURT:  And the one for the witness stand can stay

25    on.

1          DEPUTY CLERK:  Yeah, there's a button.  I can just push

2     the monitor button off.

3          MS. GABLE:  Your Honor, thank you for the accommodation.

4     I appreciate it.

5          DEPUTY CLERK:  Do it now?

6          THE COURT:  Yes.

7          MR. SKUTHAN:  Your Honor, do you want the marshal to

8     stand --

9               [End sidebar.]

10         THE COURT:  Let me have the marshals approach the bench,

11    please.

12              [Sidebar:]

13         THE COURT:  Would you stand and obstruct the monitors.

14    Just stand by the monitors, and just make sure that they don't

15    get a chance to see it, please.

16         U.S. MARSHAL:  Yes, ma'am.

17         THE COURT:  Thank you.

18              [End sidebar.]

19         THE COURT:  Ladies and gentlemen, I'm going to ask that

20    everyone that's seated what would be to my right, move to the

21    left, please.  I'm going to view a video that I am not going to

22    show to the public at this time.

23              (Public gallery adjusts seating accordingly.)

24         All right.  Ms. Gable, you may call your first witness.

25         MS. GABLE:  Thank you, Your Honor.

1          We call Special Agent Neil Burdick.

2          DEPUTY CLERK:  Sir, please step up into the witness box

3     and remain standing.  Please raise your right hand.  Do you

4     solemnly swear the testimony you will give in this case will be

5     the truth, the whole truth, and nothing but the truth, so help

6     you God?

7          THE WITNESS:  I do.

8          DEPUTY CLERK:  Please state your name, sir, for the

9     record, spelling your last name.

10         THE WITNESS:  Neil Burdick, B-u-r-d-i-c-k.

11         DEPUTY CLERK:  Thank you.

12         MS. GABLE:  May I approach, Your Honor?

13         THE COURT:  You may.

14             (Pause in proceedings.)

15         THE COURT:  All right, you may proceed.

16         MS. GABLE:  Thank you, Your Honor.

17             NEIL BURDICK, PLAINTIFF'S WITNESS, SWORN

18                        DIRECT EXAMINATION

19    BY MS. GABLE:

20    Q.    Agent Burdick, where do you work?

21    A.    I work for the Department of Homeland Security, Homeland

22    Security Investigations.

23    Q.    And what do you do for the Department of Homeland

24    Security?

25    A.    I am a criminal investigator or special agent.

| | |
|---|---|
| 1 | Q.     And in what area of investigation do you specialize? |
| 2 | A.     The majority of my cases involve child exploitation, |
| 3 | child pornography offenses, men trying to go overseas and have |
| 4 | sex with children, things like that. |
| 5 | Q.     And how long have you been investigating child |
| 6 | exploitation crimes? |
| 7 | A.     Approximately, six and a half years. |
| 8 | Q.     Are you the case agent assigned to the investigation of |
| 9 | Mr. Heffield? |
| 10 | A.     Yes, I am. |
| 11 | Q.     Can you tell the Court how Mr. Heffield came to the |
| 12 | attention of HSI? |
| 13 | A.     Yes.  I was sent what's called a collateral, which is |
| 14 | essentially a request from another HSI office.  In this case it |
| 15 | was Portland, Maine.  They had discovered -- they had served a |
| 16 | search warrant in Maine on a child pornographer up there and |
| 17 | discovered a video containing -- the video depicted a little |
| 18 | girl going to the bathroom, and the crest on the little girl's |
| 19 | shirt was that of a school here in the Orlando area, so -- |
| 20 | MR. SKUTHAN:  Your Honor, we can stipulate to the video. |
| 21 | THE COURT:  Okay.  What are you stipulating to with |
| 22 | regard to the video? |
| 23 | MR. SKUTHAN:  That they're in his possession and that |
| 24 | they're the videos that were the evidence in this case. |
| 25 | THE COURT:  Ms. Gable. |

1          MS. GABLE:   That's fine, Your Honor.   I just want to lay

2    a little foundation so the Court understands the background,

3    particularly since the Court now has been asked to make a

4    finding as to whether or not these videos contain child

5    pornography, I think the agent should be allowed to explain a

6    little bit of background --

7          THE COURT:   All right, you may proceed.

8    BY MS. GABLE:

9    Q.     You may continue.

10   A.     And through our investigation, we determined that these

11   -- this video was created at the home of Daniel Heffield.

12   Q.     And did you execute a search warrant at Mr. Heffield's

13   home.

14   A.     I did.

15   Q.     And during the course of the investigation, did you

16   interview Mr. Heffield, along with other agents?

17   A.     Yes, I did.

18   Q.     And did Mr. Heffield tell you that he had produced

19   images of child pornography?

20   A.     He did admit to us that he had set up this camera in the

21   bathroom to produce images of child pornography.

22   Q.     And did he explain to you how it is that he concealed

23   the camera in the bathroom to produce the images of child

24   pornography?

25   A.     Yes, he did.

1   Q.      What did he tell you?

2   A.      He told us that he used a portable camera, a small

3   digital camera, and placed it in between two drawers in his

4   bathroom.   And these were set up -- the camera was set on

5   pieces of clay that he had molded in order to place it in

6   exactly the right position so he could record children going to

7   the bathroom.

8   Q.      And did he tell you whether or not he posted any of

9   these videos to a newsgroup?

10  A.      Yes, he did.

11  Q.      And what did he tell you about that?

12  A.      He said he believed he posted eight or nine of them to

13  his newsgroup.

14  Q.      Did he tell you who these children were that he videoed?

15  A.      He had no idea who they were.

16  Q.      Well, how it is that he had access to them?

17  A.      These children were students of his mother's.  They were

18  taking piano lessons from his mother.

19  Q.      And did you have an opportunity to view how Mr. Heffield

20  concealed the camera?

21  A.      I did.

22  Q.      Were photographs taken of that?

23  A.      Yes, they were.

24  Q.      I have put before you, I believe, is it Government's

25  Exhibit number 2?

1   A.      Two.

2   Q.      Do you recognize those photos?

3   A.      Yes, I do.

4   Q.      And what are they?

5   A.      They are photos of the Heffield's bathroom and of the

6   set-up used by Daniel Heffield to record these children.

7   Q.      So, if you take a look at the first page of Exhibit

8   number 2, where was the camera placed?

9   A.      The camera was placed, I believe, between the first and

10  second drawers.

11  Q.      Was it in the second drawer where it was placed?

12  A.      Yes, it was in the second drawer.

13  Q.      And is that drawer directly opposite the toilet?

14  A.      Yes, it is.

15  Q.      Take a look at page number 2.  And what does page number

16  2 of Exhibit number 2 depict?

17  A.      Page number 2 depicts three drawers that are directly

18  opposite from the toilet.

19  Q.      And where did Mr. Heffield put the camera?

20  A.      In the second drawer.

21  Q.      What is Exhibit -- page number 3 of Exhibit 2?

22  A.      This is depicting the clay set-up that Mr. Heffield

23  molded to the drawer in order to set the camera in exactly the

24  right position to get a shot of the kids going to the bathroom.

25  Q.      And what is the fourth page of Exhibit number 2?

1  A.      That's just a close-up of the clay mold, the clay shelf

2  that he created.

3  Q.      And page number 5 of Exhibit number 2, what does that

4  depict?

5  A.      This is the actual camera that he used that we recovered

6  during the search warrant.  And I believe it's placed in there

7  for reference to show how the pictures were taken -- the videos

8  were taken.

9  Q.      And who told you that that's how he placed the camera in

10  the drawer?

11  A.      Mr. Heffield told us that.

12  Q.      Okay.  And what is page number 6 of Exhibit number 2?

13  A.      Again, this is a picture of the actual camera used in

14  place in the drawer, the second drawer.

15  Q.      And did Mr. Heffield explain to you when it is he would

16  put the camera in the drawer?

17  A.      He said that he would put it in the drawer when he knew

18  kids would be coming over and then recover it afterwards.

19  Q.      And after he recovered the camera, did he watch the

20  videos?

21  A.      Yes, he did.

22  Q.      And did he tell you that he masturbated to the videos?

23  A.      Yes, he did.

24  Q.      And did he tell you how it is he chose which video --

25  did he tell you whether or not he posted all of the videos he

1  made to the Internet?

2  A.    He did not post all the videos he made to the Internet.

3  Q.    Did he tell you how it is he decided which videos to

4  post?

5  A.    I believe he said that the best ones were the ones that

6  had displays of the children's genitals.

7  Q.    And did Mr. Heffield tell you that that was his purpose

8  in producing the videos which was to capture the child's

9  genitalia?

10  A.    Yes.

11  Q.    Did Mr. Heffield provide -- for what period of time did

12  Mr. Heffield tell you that he did this?

13  A.    He said it was a two to three-week period, I believe, in

14  the summer of 2012.

15  Q.    Were you able to recover the videos that Mr. Heffield

16  posted to his Internet newsgroup?

17  A.    Yes, I was.

18  Q.    And what is a newsgroup?

19  A.    My understanding of a newsgroup -- and my knowledge is

20  very limited of newsgroups, but it's a bulletin board in the

21  sense where people can post images, news.  They can chat.  Not

22  chat in the sense, but post comments, things like that.

23  Q.    And how is it that you were able to recover those

24  videos?

25  A.    I simply did a Google search for newsgroups and his

1   handle, which was Pyrex, and about -- I think there were three

2   or four hits on that that.  But I was able to go to another web

3   site, an archive web site for this newsgroup, and download the

4   videos directly from that.

5   Q.    Okay.  And when you found the videos, did you place them

6   on a CD at my request today?

7   A.    I did.

8   Q.    Take a look at Government Exhibit number 1.  Do you

9   recognize Government Exhibit number 1?

10  A.    Yes.

11  Q.    Okay.  Is it the CD that you created containing the

12  videos?

13  A.    Yes, it is.

14        MS. GABLE:  Your Honor, at this time, I would move for

15  admission of Government Exhibit number 1 and 2.

16        THE COURT:  Is there any objection?

17        MR. SKUTHAN:  No objection.

18        THE COURT:  Government's Exhibits 1 and 2 are admitted.

19        MS. GABLE:  Your Honor, may I approach?  I need to

20  retrieve.

21        THE COURT:  Yes.

22        MS. GABLE:  Thank you.

23  BY MS. GABLE:

24  Q.    Agent Burdick, once you downloaded the videos, how many

25  videos did you obtain?

```
1    A.      I obtained 14 videos.

2    Q.      Okay.  From the newsgroup?

3    A.      Yes.

4    Q.      And what did you do after you downloaded those videos?

5    A.      We sought out the victims depicted in these videos.

6    Agent Hyre and I began searching for the victims.

7    Q.      Okay.  And were you able to identify all of the kids

8    depicted in the video?

9    A.      We were not.  We were able to identify six.

10   Q.      How many children were depicted in the videos?

11   A.      There were five, five children total.

12   Q.      How many different kids?

13   A.      Five different kids.  There was one adult.

14   Q.      Okay.  All right.  And so, there was one child that was

15   18 years of age?

16   A.      Yes.

17           MS. GABLE:  All right.  Let's go ahead and show the

18   videos, Your Honor, at this time.

19           THE COURT:  Okay.

20               [Video shown.]

21   BY MS. GABLE:

22   Q.      Agent Burdick, what was that video number?

23   A.      That was S01.

24   Q.      And were you able to identify that child?

25   A.      We were not.
```

1    Q.    And in your opinion, how old is that child?

2          MR. SKUTHAN:  Your Honor, I would object.  There's no

3    predicate for that.

4          THE COURT:  I'm sorry?

5          MR. SKUTHAN:  I would object.  No predicate laid.

6          THE COURT:  Ms. Gable.

7    BY MS. GABLE:

8    Q.    Agent Burdick, in your field have you received training

9    and been able to identify children and their ages?

10   A.    Yes, I have.

11   Q.    And have you reviewed -- how many images of child

12   pornography have you reviewed?

13   A.    Countless.

14   Q.    How many videos of child pornography have you reviewed?

15   A.    Again, countless.

16   Q.    And in your area, as an investigator of child

17   pornography crimes, is it part of your training and job to be

18   able to identify whether, in fact, a child is under the age of

19   18 years of age?

20   A.    Absolutely.

21   Q.    In your opinion, Agent Burdick, how old was the child

22   depicted in that video?

23         THE COURT:  Mr. Skuthan.

24         MR. SKUTHAN:  Your Honor, we don't object if he says

25   under 18.  We're not objecting to that.  I just don't think he

1  can specify how old somebody is with his training.

2      THE COURT:  Okay.  Well, I think the question that was

3  just asked was different from the original question, and

4  Ms. Gable has laid a predicate with regard to the current

5  question which is, is the child under the age of 18 years of

6  age.  So the objection with regard to -- the first objection

7  raised is one that I would sustain.  Given the predicate that's

8  now been laid, I think the current question is appropriate.

9  A.    I do believe the child is under 18.

10 BY MS. GABLE:

11 Q.    And do you believe the child is a prepubescent child?

12 A.    Yes, I do.

13     MR. SKUTHAN:  I would object to that, Your Honor.  I

14 don't believe he has the qualifications to establish that.

15     THE COURT:  Ms. Gable, anything further?

16     MS. GABLE:  Not as to that question, Your Honor.

17     THE COURT:  Okay.  The objection is overruled.

18 BY MS. GABLE:

19 Q.    Please take a look at the next video.

20          [Video shown.]

21     What was the number of that video?

22 A.    That was S12.

23 Q.    And is that the video that was recovered by HSI out of

24 the defendant -- out of his child pornography collection?

25 A.    Yes, it was.

1    Q.    And have you identified that child?

2    A.    Yes, I have.

3    Q.    And without giving the child's name, how old was the

4    child at the time that video was made?

5    A.    She was seven years old.

6    Q.    We will turn to the next video, please.

7              [Video shown.]

8          What was the number of that video?

9    A.    S13.

10   Q.    And have you identified that child?

11   A.    Yes, I have.

12   Q.    And how old is that child at the time that video was

13   made?

14   A.    Seven years old.

15   Q.    And is that the same child that was depicted in the

16   previous video, S12?

17   A.    Yes, it is.

18   Q.    Show the next video.

19             [Video shown.]

20         Agent Burdick, what was the number of that video?

21   A.    S02.

22   Q.    And were you able to identify that child?

23   A.    I was.

24   Q.    And how old was that child at the time that that video

25   was made?

```
1    A.      Either 14 or 16.
2    Q.      Okay.  And let's turn to SO3.
3                 [Video shown.]
4            That was video S03?
5    A.      Correct.
6    Q.      And were you able to identify that child?
7    A.      I was.
8    Q.      And how old was the child in that video?
9    A.      She was 12 at the time.
10   Q.      Take a look at S04, please.
11                [Video shown.]
12           Agent Burdick, were you able to identify the child in
13   S04?
14   A.      I was not.
15   Q.      Agent Burdick, in your opinion, is that child under the
16   age of 18?
17   A.      Yes.
18   Q.      Please take a look at S05.
19                [Video shown.]
20           Agent Burdick, were you able to identify the child in
21   S05?
22   A.      I was not.
23   Q.      In your opinion, is that child under the age of 18?
24   A.      Yes.
25   Q.      Please take a look at So6.
```

1                    [Video shown.]

2          Were you able to identify the child in S06?

3     A.     I spoke with the child's mother.  She wasn't sure which

4     of her girls it was in that one, but it was either a

5     seven-year-old or nine-year-old.

6     Q.     Okay.  And take a look at S07.

7                    [Video shown.]

8          What video was that, Agent Burdick, that we just viewed?

9     A.     That was S07, I believe.

10    Q.     And were you able to identify the child in that video?

11    A.     I was.

12    Q.     And how old was the child in that video?

13    A.     Either 14 or 16.

14    Q.     Please take a look at S08.

15                   [Video shown.]

16         Were you able to identify the child in SO8?

17    A.     Yes, I was.

18    Q.     And how old was the child in that video?

19    A.     Either 14 or 16.

20    Q.     And that child is a different child also depicted in

21    S07?

22    A.     Yes.

23    Q.     S09, please.

24                   [Video shown.]

25         Were you able to identify the child in S09?

```
 1   A.      Yes, I was.

 2   Q.      And how old was the child in that video?

 3   A.      Either seven or nine.  The mother wasn't sure which girl

 4   it was.

 5   Q.      Next would be S12.  S-13.  Thank you, I'm sorry.  S13.

 6           MS. GABLE:  May we have a moment, Your Honor?

 7           THE COURT:  Yes.

 8           MS. GABLE:  Thank you.

 9               (Pause in proceedings.)

10           MS. GABLE:  Okay, we'll conclude with S14.

11               [Video shown.]

12   BY MS. GABLE:

13   Q.      Agent Burdick, were you able to identify the child in

14   S14?

15   A.      Yes.

16   Q.      And how old was the child when the video, S14, was made?

17   A.      Seven years old.

18           MS. GABLE:  Thank you.  I have no further questions.

19           THE COURT:  Cross examination.

20                         CROSS EXAMINATION

21   BY MR. SKUTHAN:

22   Q.      Good afternoon, Agent Burdick.

23   A.      Good afternoon.

24   Q.      The prosecutor showed you some photographs of the

25   bathroom of the Heffield household?
```

```
1    A.    Yes.

2    Q.    Is that correct?

3    A.    Correct.

4    Q.    Could you look at those photographs, please?

5    A.    Yes.

6    Q.    And tell me what exhibit number?

7    A.    Exhibit number 2.

8    Q.    Okay.  Are they all 2?

9    A.    Yes.

10   Q.    Okay.  And those photos were taken on April 4th; is that

11   correct?

12   A.    I believe so.

13   Q.    All right.  And that's when you were at the Heffield

14   household?

15   A.    Correct.

16   Q.    Now, when you and the other agents came to the house on

17   that day, the camera was not in the bathroom, correct?

18   A.    No, sir.

19   Q.    And according to what you're saying, Mr. Heffield had

20   said that he had had the camera in there for approximately two

21   to three weeks in the spring of 2012?

22   A.    I believe so.  Spring, summer.

23   Q.    But a total of two to three weeks?

24   A.    Yes, sir.

25   Q.    And then, he said he removed the camera?
```

1   A.      Yes.

2   Q.      And there's no evidence that he continued to film after

3   that point?

4   A.      No, sir.

5   Q.      And when you arrived at the scene on April 4th, he was

6   cooperative with you, correct?

7   A.      Yes, sir.

8   Q.      And when you asked how he did the photographs, he was

9   willing to show you, correct?

10  A.      He was.

11  Q.      And he even went so far as to identify the camera?

12  A.      Yes, he did.

13  Q.      And went so far as to place the camera in the same

14  location that -- or show you where the camera was located in

15  the bathroom?

16  A.      He did.

17  Q.      So, he freely admitted to everything that he had done?

18  A.      Yes, sir.

19  Q.      Regarding the filming in those exhibits?

20  A.      He did.

21  Q.      Now, you had indicated that you and others, I believe,

22  attempted to identify the children in the videos, correct?

23  A.      Correct.

24  Q.      And isn't it true the first thing you did to identify

25  the videos or the children in the videos was to talk to Mr. and

1   Mrs. Heffield?

2   A.      That is correct.

3   Q.      And both Mr. and Mrs. Heffield were very cooperative

4   with your agency and the FBI; is that correct?

5   A.      They were.

6   Q.      And did you visit with them or call them on more than

7   one occasion?

8   A.      I did.

9   Q.      And did you show them the videos?

10  A.      I don't remember if I did or not.

11  Q.      Okay.  Well, obviously, someone must have shown them the

12  videos somehow for them to help identify the children?

13  A.      I don't remember if we did or not.  I was given a list

14  of Mrs. Heffield's students, and so that's primarily what we

15  went off in order to try and identify the children.

16  Q.      And you got that list from Mrs. Heffield?

17  A.      Correct.

18  Q.      And she gave that to you voluntarily?

19  A.      She did.

20  Q.      And whenever you called Mr. and Mrs. Heffield, they were

21  cooperative with you in your efforts to identify the children?

22  A.      Yes, up and to a certain point, and then I did not

23  receive calls back.

24  Q.      Okay.  With your help -- with their help, you were able

25  to identify some of these children?

1    A.     I was.

2    Q.     Okay.  Now, I noticed that you testified -- Ms. Gable

3    did not show you images S10 and S11.  I assume that's because

4    in those instances there was no child pornography; is that

5    correct?

6    A.     There was video of an 18-year-old --

7    Q.     Right.

8    A.     -- using the bathroom.

9    Q.     Okay.  And then on three other videos that you testified,

10   I believe it was S04, S05, and S06, you indicated that you do

11   not know who is in those videos?

12   A.     I believe it was --

13   Q.     You were unable to identify?

14   A.     Correct.

15   Q.     Okay.

16   A.     There were several I am unable to identify.

17   Q.     So you didn't talk to persons -- I mean, you didn't know

18   who they were, so you couldn't determine the age in those

19   videos?

20   A.     Correct.

21   Q.     Okay.  And then, there were two others, I believe it was

22   S07, S08, and S02, where you indicated the person was between

23   the ages of 14 and 16?

24   A.     It's 14 or 16.  I don't remember.  It's a pair of

25   sisters, and I don't remember which one was which, but their

1    mother positively identified them as --

2    Q.    In other words, it was either one of the two sisters?

3    A.    I just don't remember which one.

4    Q.    And one was 14 and one was 16?

5    A.    Correct.

6    Q.    Okay.

7          MR. SKUTHAN:  Nothing further.

8          THE COURT:  All right, thank you.

9          Is there any redirect?

10         MS. GABLE:  Yes, Your Honor, just to correct the record.

11                     REDIRECT EXAMINATION

12   BY MS. GABLE:

13   Q.    Agent Burdick, as to the video of S06, you were able to

14   identify that child; isn't that right?

15   A.    I'd have to see the video.  I don't remember.

16   Q.    Do you want to see it?  Because --

17         MS. GABLE:  Let me just briefly show it for him.

18             (Pause in proceedings.)

19         Your Honor, I don't want to waste anymore of the Court's

20   time.  We're having some difficulty here.  I was just concerned

21   about the record, if it got confused, but it's not material to

22   the government's argument, so we'll just let it pass.

23         THE COURT:  All right, thank you.

24         MS. GABLE:  Thank you.

25         THE COURT:  Any other witnesses, Ms. Gable, with regard

1    to this issue?

2         MS. GABLE:  Not with regard to this issue, Your Honor,

3    no.

4         THE COURT:  All right.  Then, Agent Burdick, you may

5    return to your seat.

6         THE WITNESS:  Thank you, Your Honor.

7         THE COURT:  All right.  Any additional argument with

8    regard to this before the Court rules?

9         MR. SKUTHAN:  Your Honor, our argument would be that the

10   government charged three counts of production.  Mr. Heffield

11   pled to one count, which was Count number 2.  We made our

12   previous argument that the other two counts were dismissed, but

13   assuming the Court wanted to consider the images in Counts --

14   the other two child pornography production counts, we would

15   submit that under 4B1.5(b) that there are not two separate

16   instances, because of the argument made earlier that the one

17   that he pled guilty to was S12.  And while we concede that S1

18   is also child pornography, S13 and 14 contain the same person

19   as pictured in S12.  And under plain reading of the Application

20   Note, that would not garner an enhancement.  Those two are

21   separate instances of conduct under that definition.

22        THE COURT:  All right, thank you.  Ms. Gable.

23        MS. GABLE:  Your Honor, the government submits that the

24   videos of S1, S12, S13, S2, S7, S8, S09, and S14 constitute

25   child pornography in this case.  Agent Burdick testified that

 1    there were five different victims in this case, and the

 2    production occurred over a two-week period.  Those facts, Your

 3    Honor, constitute the adjustment for repeat and dangerous sex

 4    offender in this case.

 5        THE COURT:  Okay.  As it relates to the defendant's

 6    objection to paragraph 57 and the repeat and dangerous sex

 7    offender provision under United States Sentencing Guideline,

 8    Section 4B1.5(b)(1), the Court is going to overrule the

 9    defendant's objection.  In this case, there is sufficient

10    evidence with regard to the determination of pattern of

11    activity.  Here, the evidence reflects the defendant engaged in

12    a pattern of activity involving prohibited sexual conduct,

13    because on at least two separate occasions, he engaged in

14    prohibited sexual conduct with a minor.

15        The Court, based upon other cases and relevant

16    commentary from other Sentencing Guidelines provisions is of

17    the opinion that relevant conduct can be considered here to

18    allow the Court to include in the determination of repeat and

19    dangerous sex offender the other instances of the video

20    recordings, even though the defendant was not charged or did

21    not enter a plea to those offenses.  It does fall under the

22    broad umbrella of relevant conduct, and that conduct does

23    establish more than two separate occasions where the defendant

24    videotaped children using the bathroom.

25        Having viewed the videos now, I am of the opinion that

1   those videos constitute child pornography.  And I think that

2   under the Dost factors, which were discussed in the defendant's

3   sentencing memorandum and having presided over the case of

4   United States versus Johnson at 2011 WL 2446567, this case is

5   certainly distinguishable.

6        And considering the Dost factors:  1) whether the focal

7   point of the visual depiction is on the child's genitalia or

8   public area; 2) whether the setting of the visual depiction is

9   sexually suggestive, i.e., in a place or pose generally

10  associated with sexual activity; 3) whether the child is

11  depicted in an unnatural pose or in inappropriate attire,

12  considering the age of the child; 4) whether the child is fully

13  or partially clothed or nude; 5) whether the visual depiction

14  suggests sexual coyness or willingness to engage in sexual

15  activity; 6) whether the visual depiction is intended or

16  designed to elicit a sexual response in the viewer.

17       And while certainly it's clear that the focal point was

18  on the child's genitalia, while it is clear that the children

19  in this instance were nude to the extent that they were using

20  the bathroom and had removed their clothes for that purpose,

21  it's also equally clear that in this instance, based upon the

22  defendant's testimony, his recordings were intended to and did

23  elicit a sexual response in him, because he indicated that he

24  masturbated to the videos.  And so, here we have three that

25  tend to favor child pornography, three that don't.

1          Given the totality of the circumstances and evidence in

2     this case, the Court finds that those videos reflect child

3     pornography.  And again, I'm overruling the defendant's

4     objection with regard to paragraph 57, as I believe that the

5     evidence is sufficient to meet the requirements for the

6     enhancement under Section 4B1.5(b)(1).

7          Are there any other objections with regard to the PSR?

8          MR. SKUTHAN:  No, Your Honor.  The only other thing I

9     would state for the record, as to the last objection, we would

10    just want to put on the record that we also believe that the

11    Commentary violates the plain reading of the guideline in

12    4B1.5(b), and also it's unconstitutional for the previous

13    reasons we gave before for the enhancement of the penalty

14    without having to allege the facts or have a grand jury return

15    an indictment as to those additional facts.  Thank you.

16         THE COURT:  Ms. Gable, do you wish to put anything on

17    the record with regard to that, the response?

18         MS. GABLE:  Your Honor, I would just rely on my previous

19    response to the Court that there's no case law, that it's --

20    you know, that this is an enhancement, that there's nothing

21    unconstitutional about the Court being a finder of fact as to

22    guidelines adjustments, that neither increase the statutory

23    minimum or statutory maximum penalty.

24         THE COURT:  I agree with the government's response here.

25    I'm going to overrule the objection to the extent there's an

1   objection that the provision is unconstitutional.  Here, of

2   course, while the enhancement may cause the guidelines advisory

3   recommendation to exceed the statutory maximum, the guidelines

4   also require the Court to then adjust the guidelines to reflect

5   the appropriate guideline sentence as that of the statutory

6   maximum, and so any other argument with regard to the

7   constitutionality of it is overruled.

8          All right.  The Court having ruled on the defendant's

9   objections and there being no disputed factual statements,

10  other than what has previously been addressed by the Court, the

11  Court adopts the facts in the presentence report as its finding

12  of fact and determines that the guidelines, advisory

13  guidelines, in this case are as follows:

14         The Total Offense Level is a Level 42.  The Criminal

15  History Category is Category I.  The advisory guidelines range

16  for incarceration -- didn't we correct this?  It's 360 -- well,

17  let me just look at something here, excuse me.  Okay, 360

18  months to life imprisonment with 5 years to life supervised

19  release.  Restitution does not apply.  The advisory guidelines

20  range for a fine is $25,000 to $250, with a $200 special

21  assessment.  Ms. Gable, are there any victims present in the

22  courtroom?

23         MS. GABLE:  Yes, Your Honor.

24         THE COURT:  And do any of the victims wish to make a

25  statement?

1          MS. GABLE:  Yes, Your Honor.

2          THE COURT:  Okay.  You may call the first victim.  Is it

3    the victim or the victim's parent?

4          MS. GABLE:  It is the victim's parent.

5          THE COURT:  Okay.

6          MS. GABLE:  And if it's all right with the Court, she

7    has a statement that she would just like to read to the Court.

8          THE COURT:  All right, that's fine.

9          MS. GABLE:  Okay.

10         DEPUTY CLERK:  Just step to the podium.

11         >> Thank you.  Good afternoon, Your Honor.

12         THE COURT:  State your name.

13         >> My name is Beverly Norberg.

14         THE COURT:  Okay.

15         >> I am here today speaking on behalf of myself and my

16    two daughters, who were victims of Daniel Heffield's crime of

17    secretly filming both of my daughters' vaginal area while they

18    used the bathroom in their piano teacher's home.  My oldest

19    daughter was 16, we figure at the time, not really sure.  And

20    my youngest was 14, we're thinking.

21         We've known the Heffields since 2001 when my oldest

22    daughter started taking piano lessons at the age of five.  All

23    four of my children at some time have taken piano lessons from

24    Priscilla Heffield, Daniel's mother.  Because we've taken piano

25    from Priscilla for so long, we've developed relationships with

1   the Heffield family.  Priscilla referred to me as a friend, and

2   on multiple occasions my girls commented on how Mrs. Heffield

3   was like an aunt to them.  The Heffields, my girls said, were

4   like family.

5       Five years ago, Priscilla and I decided to trade out

6   services.  I would provide a meal for her each week and clean

7   and run errands and do any, you know, yard work or whatever in

8   exchange for her teaching my daughters piano.  This arrangement

9   allowed me to be around the family weekly, her family, for an

10  hour and a half or more weekly and, therefore, I saw Daniel

11  often and got to know the family very well.

12      In the 12 years that I have known Daniel, he, in my

13  opinion, has never changed.  I met him when he was 18 living at

14  home, unemployed, and spending hours on the day of the day on

15  the computer.  Funny thing, the last time I saw Daniel before

16  his arrest, he was the same kid living at home, unemployed, and

17  spending hours of the day on the computer.  The only problem

18  now is that Daniel was no longer a kid.  He was a 30-year-old

19  man.

20      So while his mother was working teaching piano, many

21  nights till 9:00 at night -- she's very hard-working -- here we

22  have a grown man with no job, eating his parents' food, using

23  their Internet and their computer to film his mother's young

24  female piano students in her bathroom for his sexual pleasure,

25  and I guess the sexual pleasure of many of his Internet

1    friends.

2         We all have to agree here this is sick.  This is a

3    30-year-old man we're talking about, Your Honor.  And just take

4    a moment to think what you were doing at the age of 30.  At the

5    age of 30, I had two-year-old newborn twins, a house, helped my

6    husband with his business, you know, manage the home.  And I'm

7    sure most of us in this room were leading similar responsible

8    lives at the age of 30.

9         Daniel has never been responsible.  While other

10   30-year-olds are out earning a living, this man is feeding his

11   sexual desire for young children, not working, but using people

12   -- his parents, other children, whoever.  You see, that's the

13   problem I have with this man.  He's not responsible.  Although,

14   I believe his parents have enabled him and they did not help

15   him to stand on his own two feet and fought many battles for

16   him, Daniel Heffield has made his own choices and must deal

17   with the consequences.

18        He has chosen not to be a contributing member of society.

19   Actually, he's proven the opposite, a menace to society.  After

20   being given many chances by his parents, he's still that same

21   18-year-old kid in a 30-year-old man's body.  I don't believe

22   time in prison will change that.  He will come out the same

23   man, no matter how long he's incarcerated.  So that is why I'm

24   asking you, Your Honor, for the maximum penalty allowed by law,

25   because Daniel Heffield won't change and will continue to be a

1   danger to children, specifically young girls.

2        Some may believe that this crime is not so bad, because

3   the girls that were being filmed weren't aware of it.  What's

4   the big deal, right?  Well, I'm here to tell you, it is a big

5   deal, and it will continue to be a big deal to my family.  The

6   day the FBI called me and asked me if they could come talk to

7   me, I had a busy house full of teenagers.  My daughter had a

8   music class going on, lots of kids.

9        Priscilla Heffield had lied to me and told me that after

10  Daniel's arrest that the FBI would want to talk to me about

11  Daniel's character, because I had known him so long.  So I

12  allowed them to come on a very busy day thinking that we would

13  have a quick conversation on the porch, and I'd be done with

14  it.  Well, little did I know that the FBI would bring a

15  computer and show me still shots from videos of my daughters

16  for me to identify.  And my husband was not home.  It was just

17  me and the two FBI agents viewing pictures of my girls in the

18  bathroom in the Heffield home.

19       The camera had been strategically placed right at the

20  view that he wanted to get their vaginal area, but they had

21  blocked the vaginal area out for me to look at the pictures.

22  I was horrified.  I was sitting with two men who I knew had

23  watched the videos in their entirety, along with many of you in

24  this room who now have.  I felt sick.  These men were only

25  doing their job, but they, and I'm sure many others, have

1    looked at my daughters.

2         I then was asked to identify them by their clothing,

3    their hair, their jewelry, something I never thought as a

4    parent that I would have to do.  I remember being so sad,

5    because my oldest daughter had seen Les Mis when it came to

6    town, and she was so proud of the t-shirt that she had on that

7    day.  I wanted to cry.  And then, at one point I realized I

8    also used that bathroom weekly when I was at the Heffields,

9    every week, so where were the videos of me?  But I was told

10   that they were probably some of the videos he said he

11   destroyed, probably wasn't interested in me at my age.

12        I was told that Daniel had purposely selected my girls

13   and others on the video and he knew their piano lesson time and

14   he would specifically set up a video camera to catch the girls

15   he wanted.  This is sick.  This made me want to throw up.  I

16   was told the images were found on another man's computer in

17   Maine.  This made me want to throw up again.  Could things gets

18   any worse?  And now, I've been told today that he masturbated

19   to pictures of my daughters.

20        I was informed, too, that Priscilla and Ron Heffield,

21   Daniel's parents, were at home back in November, six months or

22   so before, when a search warrant was served to check out

23   computers in their home.  Both Priscilla and Ron were told that

24   Daniel had downloaded child pornography on their computers, and

25   yet they chose to continue having lessons with children in

1   their home around their son, and they never informed one of us

2   parents.  Between November and his arrest in April, they even

3   allowed my girls to be alone in a room with him with the door

4   closed, one girl at a time, with the door shut to keep their

5   cat in.  I was shocked to find out that these people I

6   considered friends would knowingly put my child in danger to

7   cover for their son.

8         After the FBI left my home, I then had to go into the

9   house and act like nothing had happened and begin a series of

10  lies that my husband and I have had to conjure up to cover up

11  for this man's stupid decisions, lies that I even told them

12  today so that I could be here in court with you.

13        What's the impact on my girls?  Well, the girls have not

14  yet been impacted by this crime, because my husband and I have

15  chosen to carry this load for them, but we have had many hours

16  of discussion about this case and when and how to tell our

17  girls.  I've had many conversations with the FBI and with Karen

18  Gable on just talking about him and what's happened in the

19  case.  I've had many sleepless nights, and I think I'd like to

20  see a therapist.  I would love to.  But right now, I just can't

21  set -- I can't just have another set of lies that I have to

22  come up with for my children.  I don't like lying to my kids.

23        So, I'll continue to carry the load of this sick mess.

24  This has definitely affected our lives and our family.  It is a

25  big deal.  My husband and I have chosen not to tell the girls

1   just yet, although the time will come soon.  I was told by the

2   Victim Notification Office that these videos will be forever

3   held at the Center for Missing and Exploited Children in

4   Washington, D.C. and that we or the girls, once they turn 18,

5   will be notified when these videos surface again.  They could

6   have to deal with this for the rest of their lives.

7        Being at work, getting a phone call.  We have to tell

8   them at some point, and we know that they would want to hear it

9   from us and not someone else.  So, how will my girls respond?

10  Well, we don't know.  Knowing their personalities, though, as

11  their mother, they will both need counseling.  They trusted

12  this family.  And I'm sure it will totally freak them out to

13  know that Daniel, someone they trusted, looked at them in a

14  sexual way and did very perverted things that he did and that

15  they're piano teacher, whom they loved, would knowingly put

16  them in harm's way.

17       I don't want to be here today.  This is not fun for me.

18  This is something I've been dreading for months.  I know many

19  of the families of the girls on the videos didn't even come.

20  They chose not to do this, but I chose to come and make a stand

21  and do the hard thing today.  I felt it was important, not just

22  for my girls, because they'll be adults by the time he gets out

23  and I don't think he'll be interested in them anymore, but for

24  the protection of other little girls who will be potential

25  targets of this man's sickness.  So I'm asking you, please,

```
 1    Your Honor, to consider a tough sentence for this man, the
 2    toughest that you're allowed to give.  Thank you.
 3              THE COURT:  All right, thank you.
 4              Ms. Gable, are there others?
 5              MS. GABLE:  Yes, Your Honor.  I have one additional
 6    victim.
 7              THE COURT:  Okay.
 8              >> Hi.
 9              THE COURT:  Hello.  State your name.
10              >> Randi Rachal.
11              THE COURT:  And spell your last name for me, please.
12              >> R-a-c-h-a-l.
13              THE COURT:  All right, you may proceed.
14              >> I have known the Heffield family since I was two or
15    three.  Terri Razo babysat me growing up, and she was also the
16    secretary of the church that they pastor.  I was very involved
17    in the church.  I was there for most of the activities that
18    went on in the church.  Terri babysat a numerous amount of the
19    children at the church.  One time she had to go to a doctor's
20    appointment, and she had confirmed with my mother that it was
21    okay that Daniel watched us one afternoon.  My mom, thinking
22    nothing of it, being the pastor's son, that it would not be a
23    problem.  At one point, I had done something that I'm not
24    really -- cannot really remember exactly what it was, but I had
25    gotten in trouble.  So by my punishment, I had to sit on
```

```
 1   Daniel's lap.
 2        At some point, I was wearing overalls, and he -- he made
 3   his way into my overalls and down to my genital area and
 4   fondled me.  I do not exactly remember how long it was, but I
 5   do remember it happening.  Afterwards, I told my mother.  I
 6   felt that I didn't want to get anybody in trouble.  She didn't
 7   take it any further, but I did tell my father when I saw him
 8   the following weekend.  He called pastor.  He told pastor what
 9   he thought about it.  I remember Daniel getting on the phone
10   and telling me that he was sorry.  He also -- from then on,
11   they just swept it under the rug, and nobody talked about it
12   afterwards.  But back -- I am 21 now and this happened when I
13   was about four, and it has continued to happen.
14        THE COURT:  I'm sorry, it happened when you were about
15   how old?
16        >> Four.
17        THE COURT:  Four.
18        >> After that, I started attending school, so Terri did
19   not babysit me anymore, so I wasn't really around that church
20   anymore.  But it has obviously continued happening over the
21   years, and the Heffield family knew that it happened to me back
22   then.  So, I believe that you should -- I agree with the
23   previous woman.  You should give him the max -- the toughest
24   sentence you can, because obviously it's not gonna stop.  It
25   started way back then and it's continuing, and obviously it's
```

1    getting worse.  It's sick, and it should not continue.  And if

2    there's anything you can do to stop it from happening, it's

3    greatly appreciate it.

4          THE COURT:  All right, thank you.

5          Mr. Skuthan, I didn't ask, do you have any questions of

6    either of these witnesses?

7          MR. SKUTHAN:  No, Your Honor.  I do have a question for

8    Ms. Gable, if I can confer with her, please.

9          THE COURT:  Yes.

10               (Pause in proceedings.)

11         All right.  Ms. Gable, are any other victims present in

12    the courtroom or their parents?

13         MS. GABLE:  No, Your Honor.

14         THE COURT:  All right, thank you.

15         Mr. Heffield, do you know of any reason why the Court

16    should not impose sentence today?

17         MR. SKUTHAN:  No, Your Honor.

18         THE COURT:  Mr. Skuthan, remind me, how many witnesses

19    do you have, sir?

20         MR. SKUTHAN:  Just one.

21         THE COURT:  Just one witness?

22         MR. SKUTHAN:  Yes.  And we might be able to dispense

23    with calling him, if I can just highlight portions of his

24    report, which I don't think the government would object to.

25         THE COURT:  Okay.

1          MS. GABLE:  I don't object to that, Your Honor.

2          THE COURT:  Okay.

3          MR. SKUTHAN:  You do or you don't?

4          MS. GABLE:  I don't.

5          THE COURT:  And this is directed to the defendant.

6          Mr. Heffield, do you wish to make a statement to the

7     Court or to say anything in mitigation of your sentence, sir?

8          THE DEFENDANT:  I do.

9          THE COURT:  All right.  You may stand and do so at this

10     time or you may come to the lectern.  And direct the mic up,

11     Mr. Skuthan, because he's pretty tall.

12          THE DEFENDANT:  Your Honor, what I did was wrong.  I am

13     deeply sorry that my criminal actions have damaged the lives of

14     children I do not know and the lives and the families whom my

15     mother cares deeply for.  At the same time, my criminal actions

16     have tarnished my family's reputation.  I'm deeply sorry for

17     all this.

18          THE COURT:  All right, thank you.

19          Mr. Skuthan, do you wish to make a statement or to

20     present any argument in mitigation of the sentence?

21          MR. SKUTHAN:  Your Honor, we have a report that was

22     submitted to the Court as an attachment.  It's from ESI

23     Consulting, a Richard Connor.  Does the Court have a copy of

24     that?

25          THE COURT:  I do.

1          MR. SKUTHAN:  I probably should go ahead and mark it as

2    an exhibit.  Your Honor, this would be Defense Exhibit 1.  This

3    is a report from Mr. Richard Connor from Digital Forensic

4    Services.  The government has indicated to me that they do not

5    object to the report being considered by the Court, so I don't

6    feel the need to call Mr. Connor as a witness in this case.

7          THE COURT:  All right.  Is there any objection to the

8    Court receiving into evidence the Defendant's Exhibit 1?

9          MS. GABLE:  No, Your Honor.

10         THE COURT:  All right.  Defendant's Exhibit 1 is

11    admitted.

12         MR. SKUTHAN:  Your Honor, I'm going to refer to the

13    report in my presentation.

14         THE COURT:  Okay.

15         MR. SKUTHAN:  Your Honor, it is clear this is a very,

16    very difficult case for the people whose children were depicted

17    in the videos that were in the Heffield household.  There's

18    obviously no excuse for what Mr. Heffield did.  It was wrong,

19    it was crude, and it was criminal.  And he has no one to blame,

20    but himself for that.  He put the camera in the bathroom and it

21    was there for approximately two to three weeks and we all know

22    what he did, so that's clear and that's undisputed.  When he

23    was approached by the agents in April of this year and

24    questioned by it, he freely admitted that that's what he had

25    done.  He showed them where the camera was.  He showed them how

1    he did it, and he admitted to doing that, so there's no dispute

2    of that fact or those facts.

3         I think it's important for the Court to note and to

4    consider that in these cases when there is a secret recording,

5    such as in the Johnson case that this Court considered in Fort

6    Myers, usually the way that it comes to light is that someone

7    in the household discovers the camera.  In this case,

8    Mr. Heffield stopped filming after two, two and a half weeks,

9    and never did that again, and I think that's something that the

10   Court can consider.  Now, obviously, he uploaded some of the

11   images, and that had a detrimental effect as well, and that's

12   something that the Court has to consider also.

13        Now, at some point in August or September, the FBI was

14   able to access some images from newsgroups, and that led to

15   their investigation into Mr. Heffield.  They went to the

16   Heffield residence in November of 2012, and that was the first

17   time they went there.  And again, Mr. Heffield freely spoke

18   with them.  He talked to them about possessing child

19   pornography, about downloading child pornography, and he freely

20   admitted to that.

21        He also told the agents that he was not interested in

22   hard-core child pornography.  And obviously child pornography

23   is a crime, whether it's hard-core child pornography or not.

24   And I know to people in the public, what's the distinction, but

25   we deal with those distinctions every day in these courtrooms.

1    And in most cases that come before this court and come before

2    other judges of this court, with possession of child

3    pornography, the norm is child pornography that contains sexual

4    conduct between adults and children, sexual conduct between

5    children and children, and sometimes sexual conduct between the

6    defendant who is charged and children.  And we don't have that

7    in this case on the possession count.  What we have is

8    possession of images.  They are child pornography.  We're not

9    disputing that, nor has Mr. Heffield ever disputed that.  But I

10   think the Court can consider, in determining a reasonable

11   sentence in this case, the nature of that type of child

12   pornography.

13       It is what one would call lewd and lascivious, but not

14   any actual sexual conduct.  And this is very much unusual in

15   what we see in child pornography cases.  Matter of fact, Mr.

16   Heffield told the FBI agents that the hard-core child

17   pornography, he was not interested in that and that if he was

18   able to access that accidentally, he immediately deleted it.

19   And I think the evidence is consistent with that.

20       If the Court were to look at Mr. Connor's report, it

21   would show that some of the images that are contained in the

22   PSR as the images of the possession in this case were contained

23   on what's called carved files or files that are unallocated

24   space, these are files that had been deleted.  And in this

25   case, many of his files were deleted.

1          More importantly, there are some images that we do not

2     dispute constitute the sadistic and masochistic conduct that

3     would warrant an enhancement under the guidelines.  Typically,

4     that enhancement occurs, because there is actual penetration

5     between a man or a teenage boy and a minor and images.  That's

6     what we normally see or it's oral sex or it's regrettably anal

7     sex.  We don't have those in these images.  Also, there's no

8     videos in this particular case on the possession count, which

9     is normally what we see, but rather still images.  So, as

10    Mr. Connor points out in his report, the bulk of the images

11    were child pornography that contained children who were posing.

12         Now, again, this is not to say this is not criminal and

13    this is not to say this is not child pornography, but it's a

14    distinction that the Court must consider or should consider.

15    On page 2 of his report, he talks about the LSM series.  And in

16    those series, typically what happens is the child is clothed

17    and clothed for several pictures before at the end they remove

18    their clothing, and there is no sex taking place between either

19    the children or any adult male.

20         Now, some of the images, I would submit less than ten

21    percent of the carved images, contain the sadistic and

22    masochistic enhancement, and that's a 4-level enhancement.  In

23    that case, there was a post-pubescent girl that was tied, and

24    that constitutes the enhancement, and that's why we withdrew

25    the objection.  But I think the Court should consider that that

1   was in the carve space.  So we're not denying the enhancement,

2   but we are saying that that's something the Court can consider.

3   That's something that's consistent with his statement to the

4   FBI that he was not interested in hard-core child pornography,

5   and he subsequently deleted that.

6        On page 3 of Mr. Connor's report, it's clear that the

7   search terms and the newsgroups that are listed there are terms

8   that relate to erotica, terms that relate to voyeurism, and

9   primarily terms that do not relate to seeking child

10  pornography.  Again, did he have child pornography?  Yes.  But

11  that was not his primary search, what he was looking for.  He

12  was looking for erotica.  He was looking for items related to

13  voyeurism.

14       As Mr. Connor points out on page 4 of the report, "The

15  best I can determine is that most of the downloaded files, or

16  most activity, came from multimedia.erotica.voyeurism."  And

17  then, he gave a list of examples of file names that were

18  downloaded, and those file names that follow at the bottom of

19  page 4 are indicative of voyeurism and erotica.

20       And then, finally at the top of page 5, the most

21  prevalent names or the most prevalent search terms are

22  voyeurism, upskirt, and then pee / bathroom.  Is this

23  troubling?  Yes, it is, but it's not searching for child

24  pornography in the typical sense.  And I think the Court can

25  consider that in determining a fair and reasonable sentence in

1   this case, especially with result to the possession of child

2   pornography count.

3        I think that also goes to the production count as well

4   as what he was interested in, as despicable as it was, was not

5   the actual sex or sexual activity of minors, but rather viewing

6   what he ultimately viewed from the videos.  And that's

7   something that the Court can and should consider, we would

8   submit.

9        Now, there's a couple legal arguments that I'd like to

10  make.  And those legal arguments are such that under 4B1.5, we

11  respect this Court's decision that 4B1.5(b) applies and we

12  respect the Court's decision that 2G2.2 applies as far as the

13  pattern enhancement, but we would ask the Court to consider the

14  fact that those two together would constitute what we would

15  call double counting.

16       Now, it's clear the 11th Circuit says that's okay, that

17  you can do that, but we think the Court can consider that as a

18  factor where it overrepresents the criminal activity involved.

19  And clearly that occurs in this case, because if you look at

20  4B1.5(a), people that have a prior conviction for a sex

21  offense, they are treated under 4B1.5(a).  So if a person has a

22  prior production of child pornography, they're convicted, they

23  go to prison for 10 or 15 years, they get out and then they

24  distribute child pornography, their guideline range is going to

25  be much lower under 4B1.5(a) than it would be under 4B1.5(b)

1    under the circumstances similar to Mr. Heffield, and I think

2    the Court can consider that in imposing a reasonable sentence.

3         The other thing I think the Court can consider is that

4    there are other cases, and each case is unique.  And I set

5    forth some of these cases in the sentencing memorandum, and I

6    don't want to belabor each one, but there's a whole scope of

7    production of child pornography, and all of it is distasteful

8    and all of it is reprehensible.  But at the far edge are

9    defendants who produce child pornography and they produce child

10   pornography when they, themselves, are, in fact, involved in

11   sexual activity with children.

12        The government pointed out in its sentencing memorandum

13   the Sarras case.  That's spelled S-a-r-r-a-s.  And that's one

14   of those examples where the defendant, on more than ten

15   occasions engaged in sexual intercourse with a minor, on more

16   than ten occasions engaged in oral sex with a minor and

17   videotaped each and every incident, and he was given an extreme

18   sentence.

19        Another defendant along those lines is Mr. Irey, I-r-e-y,

20   who the Court found was involved in more than 50 acts of child

21   rape and torture and filmed each and every one of those acts.

22   It was a crime that the 11th Circuit Court of Appeals said was

23   the worst of the worst, and I think everyone can agree with

24   those facts, that it was the worst of the worst.  And Mr. Irey

25   was given a 30-year -- originally given a 17-year sentence.

1    The government appealed.  They lost the appeal.  They did not

2    seek a rehearing.  The 11th Circuit on its own took a rehearing

3    en banc, and it went back and he got a 30-year sentence, but

4    that was the maximum.  He was allowed a plea of one count of

5    production of child pornography, and he got 30 years.

6        The next spectrum, I would submit to the Court, is where

7    a defendant films other people who are minors having sex.  And

8    that's what happened in Mr. Devlin's case where he had a young

9    man who was an adult recruit a 13-year-old boy, bring the boy

10   back to the hotel, told them to have sex, paid them to have

11   sex, and videotaped the whole thing.  He did this once.  He did

12   this twice.  From my review of the record, he did not receive

13   4B1.5 enhancement, but I would submit to the Court that that

14   conduct was reprehensible.  He paid a child to have sex, told

15   the child how to do it, he filmed it, and the sentence in that

16   case was 15 years.

17       In the case of Adam Brigham, which I think is another

18   horrendous case, in that case the defendant did not engage in

19   sexual activity, but he met an unsuspecting child on the

20   Internet.  The child was 14, and Mr. Brigham manipulated the

21   child into masturbating and filming himself masturbating and

22   then sending this to Mr. Brigham and Mr. Brigham, then,

23   uploaded the images.  And what was particularly horrible about

24   that case is Mr. Brigham was laughing about it to the agents.

25   He referred to the 14-year-old boy as his "Little Porn Star"

1    and other disparaging names.  He manipulated the child into

2    having sex and posted his image on the Internet.  And he asked

3    the child to do just unspeakable, disgusting things, which are

4    in the memorandum, which I won't repeat.  And Mr. Brigham was

5    sentenced to 15 years as well.

6         And finally, there were two other cases in the

7    memorandum.  One was a Mr. Baker, who engaged -- or had

8    children engage in sexual activity on five separate instances.

9    He received a 25-year sentence.  And then, Mr. Beyel is listed

10   in the memorandum as well.

11        I understand that every case is different and you can't

12   compare apples and oranges, but I think that's a pretty good

13   overview of the cases that have been adjudicated here in this

14   division in recent years, and I think the Court can consider

15   those factors in determining a fair and reasonable sentence.

16        In order to impose a sentence, the Court has to impose a

17   sentence that protects the public, promotes respect for the

18   law, reflects the seriousness of the offense, and all those

19   factors in those cases, at least in the Brigham and the Devlin

20   case, were satisfied by a 15-year sentence.  I think the Court

21   should also consider the fact, as I've brought up before and I

22   know the Court's aware of this argument, if Mr. Heffield went

23   to play on the beach and had sex with a 14-year-old girl, under

24   the federal guidelines, he'd be looking at two and a half years

25   in prison and not even a single mandatory minimum sentence.

1    So, a sentence in this case below the guideline range would

2    promote respect for the law and would be a just punishment.

3           I have just a few more things to say.  I know we're

4    running out of time, but I want to make sure I just cover

5    everything.  I think the Court can consider that Mr. Heffield,

6    at the time that he was approached by the agents in November,

7    had indicated that he was in counseling.  I know he had been in

8    counseling a long time.  His parents had discovered some

9    troubling images in August of 2012.  He had been in counseling

10   previously, but he continued to go into counseling, and he

11   continued to try to work through his issues.  That is not an

12   excuse for his conduct or behavior, but he was trying to deal

13   with his issues.  And the best way to do that is through

14   counseling, and he was doing that.  And I think the Court can

15   consider that as well.

16          Now, did he relapse?  Yes, he did.  And he did some

17   things he shouldn't have done, but he was in counseling.  He

18   was trying get himself better and trying to wean himself off

19   this habit that he had.  I think at the end of the day, the

20   defendant is 30 years old.  I respect what the -- the two --

21   the mother of the one victim testified to as well as the other

22   woman who indicated that she knew Mr. Heffield, and I

23   understand what they're saying.

24          Mr. Heffield did work, though.  He worked most of his

25   adult life.  It wasn't a long-term job, but he's always had a

1   job.  Sometimes he's had bouts of unemployment, that's true.
2   He has a very, very supportive family.  I believe the Court has
3   viewed the video from his sister, who gave a statement on his
4   behalf, as well as the parents.  The parents are here today,
5   and they don't condone his actions.  It's been very painful for
6   them, especially since this happened in their house.  But
7   they're here today to support their son, but also they're here
8   knowing that he has to be punished, and they're here with
9   friends that also support him.  They're not supporting what he
10  did, but they know for him to get over what he's done, he has
11  to have family support and the support of friends, and he needs
12  that.
13         Finally, I would point out that the testimony of the one
14  woman who testified previously that spoke of Mr. Heffield
15  touching her inappropriately, she indicated she's 21 years old
16  and it happened when she was four, Mr. Heffield would have been
17  13 or 14 at the time it happened, so I think the Court can
18  consider that as well.
19         In all, I think the Court can consider all the factors
20  and circumstances and the circumstances of this offense, the
21  history and characteristics of Mr. Heffield, the fact that he
22  stopped filming.  We know that he uploaded it and he shouldn't
23  have done that, and that's what makes this translate from more
24  into a voyeurism case into a child pornography case, but we
25  would ask the Court to consider all of those factors, as well

1    as the factors in Mr. Connor's report and impose a sentence

2    well below the guideline range in this case, especially in

3    figuring the other sentences that have been imposed in similar

4    cases in this district.   Thank you.

5         THE COURT:   All right, thank you.

6         Ms. Gable, do you know of any reason why the Court

7    should not impose sentence today?

8         MS. GABLE:   No, Your Honor.

9         THE COURT:   Do you wish to be heard as to the sentence?

10        MS. GABLE:   Yes, Your Honor.

11        THE COURT:   All right.

12        MS. GABLE:   Your Honor, Mr. Heffield is a long-time

13   offender of children.   As Mr. Skuthan just said, his offending

14   began when he was age 13 years old.   His offending has

15   continued until 30 years of age when the government arrested

16   him, and he was detained by law enforcement.   In between that

17   time, Your Honor, and just so the Court has a perspective of

18   what happened here, Mr. Heffield is a prolific distributor of

19   child pornography.

20        This case originated when an FBI agent downloaded

21   compressed files containing thousands of images of child

22   pornography from a newsgroup that Mr. Heffield was posting to.

23   Some of the images that Mr. Heffield posted were the images

24   that Mr. Skuthan referred to in his remarks to the Court

25   involving a child that was bound, he referred to as a

 1    post-pubescent child.  She was about 12 or 13 years of age, and

 2    there were numerous images of her tied with rope with things

 3    inserted inside of her.  Most of the images that were found on

 4    Mr. Heffield's computer did involve lascivious display of the

 5    genitals, as Mr. Skuthan discussed, but Mr. Heffield was a

 6    prolific distributor.  The FBI agent downloaded many, many,

 7    many images of child pornography from Mr. Heffield, and agents

 8    executed a search warrant.

 9         When they executed the search warrant, they encountered

10    the Heffields, who appeared to be a loving family who had

11    control of their son, and so he wasn't arrested at that time.

12    In the meantime, the Department of Homeland Security discovered

13    that a video of child pornography, one of the bathroom videos,

14    was found in the collection of a Maine defendant's computer and

15    began an investigation, and it led back to the Heffields.  At

16    the U.S. Attorney's Office, we deconflicted and realized that

17    we had executed a search warrant.  And once we discovered what

18    had happened here, we immediately went out and we sought an

19    indictment of Mr. Heffield and he was arrested.

20         At that time, Your Honor, despite the fact that the

21    government had been out to Mr. Heffield's house a few months

22    earlier executing a search warrant for child pornography,

23    Mr. Heffield admitted that he continued to look at child

24    pornography on a computer at his church.  So, Mr. Heffield is

25    an individual who has been offending since he was 13 years of

1    age, continuing up to the age of 30.

2         Despite receiving counseling, despite having a

3    supportive family, despite law enforcement intervention,

4    Mr. Heffield did not stop exploiting children.  Mr. Heffield's

5    prior practices, his prior conduct of engaging in the viewing

6    and exploitation of children and child pornography, even after

7    these interventions is a great predictor of what he will do in

8    the future.  He is a serious danger to children, Your Honor.

9    But Mr. Heffield was not just a prolific distributor.  He

10   engaged in this despicable act of videotaping these children

11   using the bathroom in order to capture video of their

12   genitalia, and then posted it to the Internet.  That is what

13   separates Mr. Heffield from the normal child pornographers and

14   even individuals that produce child pornography that are

15   prosecuted in this court.

16        Typically, Your Honor, individuals who produce child

17   pornography are family members, and they keep it to themselves.

18   But Mr. Heffield found a way and insisted upon distributing it

19   on the Internet, and it found its way into a defendant in Maine

20   into his child pornography collection.  What's even

21   additionally reprehensible about this, Your Honor, is that as

22   the Court saw, many of these children were wearing their school

23   uniforms with their logo, and it was not hard for the agents of

24   HSI to identify these children from the logo on their shirt,

25   and that's out there for everybody to see and everybody to

1   view, so he's put all these children at risk by his actions.

2        The defendant has cited some cases to the Court to

3   consider, because sentencing parity certainly is an issue under

4   3553(a) for the Court to consider, but the Devlin case is a

5   case that I prosecuted.  And in that case there was one victim,

6   and the 4B1.5 adjustment did not apply in that case.  And

7   unlike Mr. Devlin, Mr. Heffield distributed the videos that he

8   produced and was a prolific distributor and collector of child

9   pornography, and Mr. Heffield has a long history of offending

10  against children.

11       I prosecuted a case, Harnois, United States versus

12  Harnois.  He received a sentence of 27 years.  He was a

13  distributor of child pornography, but he did not distribute

14  nearly the quantity of child pornography that Mr. Heffield

15  distributed.  He did not produce videos of child pornography

16  like Mr. Heffield, however, he did sexually touch a child.

17       The defendant here has committed a serious offense.  He

18  is a serious danger to the community, and deterrence in this

19  case is a particularly weighty factor.  So for those reasons,

20  Your Honor, we'd ask the Court to sentence the defendant to the

21  low end of the guidelines, which is 30 years, followed by a

22  life term of supervised release.  The defendant has

23  demonstrated that he is an extreme danger, and he does need a

24  lifetime of supervised release, Your Honor.  Thank you.

25       THE COURT:  All right, thank you.

1          All right.  We will be in recess for ten minutes.

2          Did you want to say something before I break,

3    Mr. Skuthan?

4          MR. SKUTHAN:  Yes.  Your Honor, on one issue.  I hope I

5    was clear, but I don't think I was.  We do not concede that

6    Mr. Heffield was involved in any activity with the woman that

7    came in here and testified.  She was four years old.  Now, what

8    we said was if that's the case, if he was 13 at the time, he

9    doesn't remember anything of that nature.  I don't know what

10   she remembers.  I know she was four years old at the time.  The

11   government is alleging that he's been involved in sexual

12   contact ever since then.  I don't think the record demonstrates

13   that.  There's been no other allegations recently of anything

14   that's happened around the time period from when these acts

15   occurred.  So, I don't think there's any evidence of that,

16   Your Honor.

17          THE COURT:  All right.  We are in recess for ten minutes.

18               (Recess from 3:50 p.m. to 4:05 p.m.)

19          Mr. Heffield, I have had an opportunity, sir, to review

20   your presentence report in detail.  I have listened to your

21   attorney's argument here today.  I have listened to argument

22   from counsel for the government.  I've listened to the

23   statements from two victims -- well, one victim from an

24   incident that occurred apparently when you were a child, as

25   well as when she was a child, and then listened to the parent

1    of two of the young girls who you videotaped at your mother's

2    home.  I've also considered the sentencing memoranda that have

3    been filed, one on behalf of the government, one on behalf of

4    your attorney, as well as the report from Richard Connor of ESI

5    Consulting.  And then, finally, I have considered the disc of

6    the statement from your sister who was here visiting for the

7    holidays and has now returned to abroad.

8         As the attorneys have heard me say before, sentencing is

9    probably the toughest job I have as a federal district judge.

10   Child pornography cases, in and of themselves, are particularly

11   reprehensible crimes.  This case is no exception to that.  Like

12   many of the other defendants appearing before me in child

13   pornography cases, you have no prior criminal history.  You

14   come before the Court on two counts, one count of distribution

15   and one count of possession.

16        I will certainly agree with your attorney that to the

17   extent there is any less egregious type of child pornography

18   that this consisted of, the acts depicted in the videos that I

19   watched were certainly less egregious than the hard-core child

20   pornography that I usually see.  Does that mean that it's any

21   less egregious to the victims whose private actions or

22   activities of using the bathroom have been distributed on the

23   Internet and may continue to be distributed for years to come?

24   Absolutely not.  I do understand, from listening to everything

25   that I've heard this afternoon, that of your own accord you

 1    stopped filming the young girls after two to two and a half

 2    weeks.  I am troubled, however, by the fact that there was some

 3    indication of some issues that you needed to deal with.

 4         I've heard from Randi Rachal, who indicated that you

 5    fondled her when she was four.  And, of course, as Mr. Skuthan

 6    pointed out, you would have been a child yourself or at least a

 7    teenager at that time.  I've read in the presentence report

 8    that you did, indeed, attend counseling at one point trying to

 9    come to grips with the issues you were dealing with, but you

10    were not successful and that you relapsed.

11         I understand from Mr. Skuthan's argument, as well as

12    from your sister's comment in the video, that you do have a

13    supportive family structure, but I do think you are an

14    individual who needs a significant period of incarceration for

15    a number of reasons -- to protect our minor children from

16    future acts; also, so that you can get some help and some

17    treatment.  And then, of course, that help and treatment will

18    continue when you are released from custody.

19         In viewing this case and comparatively speaking, one of

20    the things that I want to make sure that I do is impose a

21    sentence that is sufficient, but not greater than necessary to

22    comply with the purposes of sentencing, but yet recognize the

23    serious nature of the offenses for which you have entered pleas

24    of guilty.  The evidence does, indeed, reflect that you have

25    been distributing child pornography for awhile, that you taught

1   others how to download or upload the child pornography, that

2   you even continued to view the child pornography after a

3   subpoena was served on the computers at your parent's residence

4   by looking at a computer at your church.

5        The evidence also indicates or reflects that at one

6   point you made a statement that, you know, you were concerned

7   with regard to some of the issues -- or let me just see if I

8   can find it, because I don't want to misstate it.  This is from

9   paragraph 19 of the PSR where the agents located the text of

10  one of your posts that stated, "As I said, I won't be able to

11  access anymore for future posts anytime soon.  Sorry.  Wish I

12  could.  Getting too risky on my end though.  Outside issues.

13  Don."

14       So it's clear that you were aware of the criminal

15  actions that you were participating in, that you chose to

16  continue to participate in the downloading and uploading and

17  distribution of child pornography.  The evidence reflects that

18  the forensic examiner located over 1,300 images of child

19  pornography on the devices that were obtained from your

20  residence.  And again, while I acknowledge that some of these

21  images depicted girls using the toilet, it still, nevertheless,

22  constitutes child pornography and, of course, they will be

23  victims as has been presented here today.

24       In considering your case, I am going to impose a

25  sentence of 300 months, and that is a slight variance from the

1   360 that the guidelines recommends, but that is in keeping with

2   my usual sentence, if you will, for child pornography cases.  I

3   have repeated that I do think that our child pornography

4   guidelines should be reviewed and re-evaluated.  I am

5   particularly concerned with regard to some of the enhancements

6   that are applied.  I have considered your attorney's argument

7   with regard to what he believes to be double dipping.  And

8   although I don't think that the case law supports that

9   argument, I understand the argument and have given that

10  argument some consideration in entering a sentence or imposing

11  a sentence of 300 months.

12      I also have considered your individual history and

13  characteristics, the fact that you have no prior criminal

14  history, and I usually consider that.  The evidence here does

15  suggest that you may have, as Ms. Gable argued, a long history

16  of being involved with or a long-time offender of children.

17  The evidence before me doesn't necessarily support that you've

18  been a long-time offender.

19      It does, however, suggest that at least since you were

20  about 13 or 14 -- and you were a child yourself at that time,

21  and so to me that is somewhat distinguishable, although

22  nevertheless reprehensible, somewhat distinguishable from

23  someone who is an adult and then who fondles children.  But I

24  am convinced that you were a horrific distributor of child

25  pornography and that as a result of that you should be

1  punished, that I'm going to impose a sentence of 300 months in

2  order to protect the public from further crimes of the

3  defendant.

4       I also hope that while you are incarcerated, you can get

5  the needed treatment to help with the mental issues associated

6  with your attraction to child pornography.  I also have imposed

7  the sentence to protect the minor children, because it will be

8  a sentence of 300 months, followed by a lifetime of supervised

9  release.

10      There is also a need to promote respect for the law and,

11  of course, to provide just punishment.  I'd also like to deter

12  others from similar acts.  While I'm not persuaded that in

13  child pornography cases the sentences have that effect, I still

14  believe that there is a need to deter others.  And to the

15  extent that this sentence may deter others, then I am hopeful

16  that it will have that effect.

17      And so, having considered the guideline factors, having

18  considered the fact that there is no reason why I should not

19  impose sentence today, being very familiar with the facts of

20  this case, pursuant to Title 18, United States Code, Sections

21  3551 and 3553, it is the judgment of the Court that the

22  defendant, Daniel Heffield, is hereby sentenced to a term of

23  300 months.  The term consists of a period of 300 months on

24  Count 2 and a term of 120 months on Count 9.  All of these

25  terms are to run concurrently.

1      Upon release from imprisonment, Mr. Heffield, you shall

2  serve a life term of supervised release on each of Counts 2 and

3  9, all such terms to run concurrently.  While on supervised

4  release, you shall comply with the standard conditions adopted

5  by the Court in the Middle District of Florida.

6      In addition, you are to comply with the following

7  special conditions.  You shall participate in a mental health

8  program specializing in sexual offender treatment and submit to

9  polygraph testing for treatment and monitoring purposes.  You

10  are also to follow the probation officer's instructions

11  regarding the implementation of this court directive.

12      Further, you shall contribute to the cost of such

13  treatment and/or polygraphs, not to exceed an amount determined

14  reasonable by the probation officer based on your ability to

15  pay or the availability of third-party payment and in

16  conformance with the Probation Office's sliding scale for

17  treatment services.  You are to register with the state's

18  sexual offender registration agency in any state where you

19  reside, visit, are employed, carry on a vocation, or are a

20  student as directed by the probation officer.

21      The probation officer shall provide state officials with

22  all information required under the Florida sexual predator and

23  sexual offender notification and registration statutes and/or

24  the Sex Offender Registration and Notification Act and may

25  direct the defendant, that being you, Daniel Heffield, shall

1  report to these agencies personally for required additional

2  processing, such as photographing, fingerprinting, and DNA

3  collection.

4       You shall have no direct contact with minors, that's

5  individuals under the age of 18, without the written approval

6  of the probation officer, and you shall refrain from entering

7  into any area where children frequently congregate, including

8  schools, daycare centers, theme parks, playgrounds, and the

9  like.  You are prohibited from possessing, subscribing to or

10  viewing any images, video, magazines, literature, or other

11  materials depicting children in the nude and/or in sexually

12  explicit positions.

13       You shall not possess or use a computer with access to

14  any on-line service at any location, including employment,

15  without the written approval from the probation officer.  This

16  includes access to any Internet service provider, bulletin

17  board system, or any public or private computer network system.

18  You shall permit routine inspection of your computer system,

19  hard drives, and other media storage materials to confirm

20  adherence to this condition.

21       This inspection shall be no more intrusive than is

22  necessary to ensure compliance with this condition.  You shall

23  also inform your employer or other third party who may be

24  impacted by this condition of this computer-related restriction

25  and the computer inspection provision of the condition.

1      You shall submit to a search of your person, residence,

2   place of business, any storage units under your control,

3   computer or vehicle conducted by the United States probation

4   officer at a reasonable time and in a reasonable manner, based

5   upon reasonable suspicion of contraband or evidence of a

6   violation of the condition of release.  You shall inform any

7   other residents that the premises may be subject to a search

8   pursuant to this condition.  Failure to submit to a search may

9   be grounds for revocation.

10      You shall be prohibited from incurring new credit

11   charges, opening additional lines of credit, or obligating

12   yourself for any major purchases without approval of the

13   probation officer.  You are also to provide the probation

14   officer access to any requested financial information.  Having

15   been convicted of a qualifying felony offense, Mr. Heffield,

16   you shall cooperate in the collection of DNA, as directed by

17   the probation officer.

18      The mandatory drug testing requirements of the Violent

19   Crime Control Act are imposed.  Therefore, the Court orders you

20   to submit to random drug testing not to exceed 104 tests per

21   year.  Based upon your financial status, the Court waives the

22   imposition of a fine.  However, you are ordered to pay to the

23   United States a special assessment.  That special assessment

24   totals $200, and it's due immediately.

25      There are matters with regard to forfeiture; is that

1   correct, Ms. Gable?

2         MS. GABLE:  Yes, Your Honor, there are.

3         THE COURT:  Would you identify for the record, the items

4   that the defendant is forfeiting.

5         MS. GABLE:  Yes, Your Honor.  They are the items set

6   forth in document number 40 filed in this case.  They are:

7         1.  A Western Digital external hard drive.

8         2.  An Apple Mac Book laptop computer with an internal

9   hard drive.

10        3.  An Apple iMac computer and internal hard drive.

11        4.  Kodak camera.

12        THE COURT:  I am entering a preliminary order of

13  forfeiture with regard to these items.

14        After considering the advisory Sentencing Guidelines and

15  all of the factors identified in Title 18, United States Code,

16  Sections 3553(a)(1) through (7), the Court determines that the

17  sentence imposed is sufficient, but not greater than necessary

18  to comply with the purposes of -- statutory purposes of

19  sentencing.

20        As I've previously indicated, I've varied somewhat based

21  upon a number of things, including your lack of a prior

22  criminal history, which would be the nature and circumstances

23  of the offense.  In the scheme of things, although the items

24  were -- certainly the videos were pornographic, you've

25  indicated and the evidence suggests that you are not one who

1   views the hard-core porn but, nevertheless, it was pornographic

2   in nature.  Your actions do fall more in the nature of

3   voyeuristic actions which, as I said before, don't excuse your

4   behavior and are equally as reprehensible to the victims, but

5   it was something that I considered in imposing this sentence in

6   this case.  I also looked at -- considered the arguments

7   previously addressed and otherwise believe that the sentence is

8   sufficient, but not greater than necessary to comply with the

9   statutory purposes of sentencing.

10          In this case, Mr. Heffield, you entered into a plea

11  agreement.  The Court has accept the plea agreement, because

12  the Court is satisfied that the agreement adequately reflects

13  the seriousness of your actual offensive behavior and that

14  accepting the plea agreement will not undermine the statutory

15  purposes of sentencing.

16          In accordance with the plea agreement, Ms. Gable, do you

17  have a motion?

18          MS. GABLE:  Yes, Your Honor.  The government moves to

19  dismiss Counts 1, 3, 4, 5, 6, 7, and 8.

20          THE COURT:  All right.  In accordance with the plea

21  agreement, the Court, then, will dismiss Counts 1, 3, 4, 5, 6,

22  7, and 8 of the superseding indictment.  Furthermore, it is

23  ordered that the underlying indictment be dismissed.

24          The Court having pronounced sentence, does counsel for

25  the defendant or government have any objections?

1      MS. GABLE:  Your Honor, the government does not have any

2   objection to the sentencing.  We do move to seal Government

3   Exhibit number 1.

4      THE COURT:  Is there any objection?

5      MR. SKUTHAN:  Yes, Your Honor.  We respect the Court's

6   sentence and the fact that it is a downward variance.  We,

7   however, view the sentence as being substantively unreasonable

8   under the following factors.  Number one, the Court pointed out

9   imposing the length of sentence so that the defendant could get

10   adequate treatment and counseling.  Obviously, he could get

11   treatment and counseling with a much lesser sentence.

12      We also would point out that the Court indicated this is

13   more on the end of a voyeuristic type activity, and we think in

14   line of other cases sentenced in this district, particularly

15   the Devlin case, which was prosecuted by Ms. Gable and the

16   Brigham case which Ms. Gable signed off on where two hands-on

17   offenders got 15 years, that the sentence is unreasonable, and

18   we respectfully submit that to the Court.  Thank you.

19      THE COURT:  Okay.  Do you wish to respond for the record,

20   Ms. Gable?  I mean, I think you've addressed the cases that you

21   were involved in.  I just offer that to the extent you wish to

22   be heard.

23      MS. GABLE:  No, Your Honor.  I have nothing to add other

24   than to say that Mr. Devlin was not a hands-on offender.  But

25   regardless, the government has no objection to the sentence.

1          THE COURT:  Okay.  As it relates to Government's Exhibit

2     1, I will grant the motion, and it is going to be sealed.

3          Finally, Mr. Heffield, to the extent permitted by your

4     plea agreement, you have the right of appeal from this sentence

5     within 14 days from this date.  Failure to appeal within the

6     14-day period shall be a waiver of your right to appeal.  The

7     government may file an appeal from this sentence.  You are also

8     advised that you are entitled to the assistance of counsel in

9     taking an appeal.  And if you are unable to afford a lawyer,

10    one will be provided for you.  If you are unable to afford the

11    filing fee, the clerk of the court will be directed to accept

12    the notice of appeal without such fee.

13         Is there anything further regarding this case?

14         MS. GABLE:  No, Your Honor.

15         THE COURT:  Let me just look here.  Give me just a

16    moment.  One of the things that I need to recommend that I

17    didn't include, I ordered it for the supervised release period,

18    but I'm also going to include on the judgment, Mr. Heffield,

19    that you be considered for mental health treatment during the

20    time of your incarceration.  Again, that decision remains with

21    the Bureau of Prisons, but I think it is something that would

22    be appropriate considering the offenses for which you have been

23    convicted.

24         And let's see, I'm going to give the clerk Government's

25    Exhibit 2.  If there's nothing further then, Mr. Heffield, you

1    are hereby remanded, sir, to the custody of the United States

2    Marshal to await designation by the Bureau of Prisons.  That

3    concludes this proceeding.

4         MR. SKUTHAN:  Your Honor, we did have a recommendation

5    or asked the Court to recommend placement in a BOP facility as

6    close to the state of Florida as possible.

7         THE COURT:  Is there any objection?

8         MS. GABLE:  No, Your Honor.

9         THE COURT:  Mr. Heffield, I will include on the judgment

10   a recommendation that you be placed at a facility as close to

11   the state of Florida as possible.  Again, you should understand

12   that the final decision regarding placement remains with the

13   Bureau of Prisons.  All right, that concludes this proceeding.

14        (Adjourned at 4:28 p.m.)

15             - - - - - - - - - - -

16             Certificate of Official Reporter

17

18   I hereby certify that the foregoing is a true and correct

19   transcript of the stenographically reported proceedings held in

20   the above-entitled matter.

21

22

23   /s/Koretta Stanford        3/25/14
     _____
24   Koretta Stanford, RMR, CRR    Date
     Official Court Reporter

25